Gloria Denise WALKER, Appellant,

v.

Terry Dannett CHATFIELD, Appellee.

No. 49A04–8812–CV–00416.

Court of Appeals of Indiana,
Fourth District.

April 24, 1990.

Lorine Brown Regulus and Kevin L. Scionti, Roberts & Bishop, Indianapolis, for appellant.

Daniel F. Cummings, Cummings & Merriman, Indianapolis, for appellee.

MILLER, Judge.

Gloria Walker, after a hearing before the trial court, lost custody of her eight-year-old daughter to the child's father, Terry

Chatfield. The initial custody determination had been decided in 1981 under the paternity statute, IND.CODE § 31-6-6.1-11. On January 11, 1988 Chatfield filed a petition for temporary custody, restraining order and a vacation of wage assignment alleging the child had been "abandoned" by Walker. The trial court granted the petition. After a hearing on January 22, 1988, the trial court left the temporary custody of the child with Chatfield, although the child was actually staying with Chatfield's mother. The change separated the child not only from her mother, but also her two half-brothers (then ages 7 and 4) and her half-sister (then age 11). On September 13, 1988 the trial court awarded custody to Chatfield.

The issue Walker raises in her appeal is whether the judgment granting permanent custody to Chatfield was contrary to law where there was no evidence of abandonment, and no showing of a substantial and continuing changed circumstances in her home. She also claims the judgment was contrary to law because the child was, in effect, placed with the paternal grandparents.[1]

We agree with Walker that there was a lack of evidence of a decisive and substantial change in circumstances affecting the welfare of the child, and reverse.

## DECISION

 This custody action was initiated by Chatfield (Father) on the basis that the child was abandoned.[2] There was no substantial evidence supporting Father's claim; however, the unsupported claim enabled Father to gain temporary custody and later permanent custody. We are sensitive to the difficulties trial courts encounter in making custody determinations, and to the fact that we only reverse when there is abuse of the judge's discretion. Therefore, we have carefully reviewed the record. We believe that the judge made his determination of custody as he would have at an initial custody determination and did not properly take into consideration the standards required for *modification* of custody. In this regard we observe that, in an initial custody determination, the court presumes the parties are equally entitled to custody, but makes a decision based on which parent would be better. In subsequent hearings to modify custody, the petitioning party bears the burden of overcoming the custodial parent's right to continued custody because of our jurisdiction's policy that a permanent home is considered best for the welfare of the child. Thus, our courts have held that, in modification proceedings, the change in the custodial home must be one of a decisive, substantial and continuing nature. *In re Marriage of Henderson* (1983), Ind.App., 453 N.E.2d 310. We recognize that there will always be changes in circumstances between the initial hearing and subsequent hearings— the child matures, parents may remarry, divorce, move, have more or less income than at the initial hearing, there may be other children added to the family through birth or remarriage that change the relationship of the child to the custodial parent, and so forth.

But what life is all about *is* growth and change. However, these changes, which we take for granted, do not automatically trigger the right of a court to re-examine whether or not one parent might be preferred as custodian over another, as is the test at an initial hearing. Thus, mere changes that occur as life goes on do not, standing alone, justify a modification of custody. What we look for when we review the trial court's action is evidence of a decisive and substantial change in circumstances which either establishes the unfitness of the custodial parent or affects the welfare of the child so that it renders the original custodial order unreasonable. For the reasons we state below, we conclude there was no showing of a substantial and continuing change in the custodial parent's

---

1. Mother raises a third issue—whether the temporary custody order was contrary to law. We need not address that issue which is now moot.

2. Father also alleged that Mother was selling drugs, but there was no supporting evidence of this in the record.

circumstances warranting a change of custody from Walker (Mother) to Father.

### Scope of Review

 The best interest of the child is committed to the sound discretion of the trial court and will be only reversed on appeal upon a showing of abuse of that discretion. *Marshall v. Reeves* (1974), 262 Ind. 107, 311 N.E.2d 807, 811, *opinion supplemented on other grounds*, 262 Ind. 403, 316 N.E.2d 828; *Hyatte v. Lopez* (1977), 174 Ind.App. 149, 366 N.E.2d 676 (child custody in paternity case); *Fox v. Fox* (1984), Ind.App., 466 N.E.2d 789 (child custody under divorce statute). An abuse of discretion exists where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court or the reasonable, probable and actual deductions to be drawn therefrom. *Campbell v. Campbell* (1979), 182 Ind.App. 661, 396 N.E.2d 142.

 Our function on appeal is to examine the decision of the trial court and determine whether the record discloses evidence or reasonable inferences to be drawn therefrom which serve as a *rational* basis to support the finding of the trial court. We will not reweigh the evidence or judge the credibility of the witnesses. *K.B. v. S.B.* (1981), Ind.App., 415 N.E.2d 749, 755.

Our supreme court has set out the standards for appellate review of a trial court's custody modification. The first situation in which a reviewing court may *reverse* a custody modification is where there are a combination of two deficiencies: 1) a failure to allege and prove a decisive change in conditions, and 2) no findings by the trial court that there existed such changes in conditions which warranted modification. Absent such deficiencies, the abuse of discretion rule comes into play. *Marshall v. Reeves, supra*, 262 Ind. at 113, 311 N.E.2d at 811. Under either analysis, the result is the same in this case. The Father made allegations of abandonment which were unsupported by the evidence. The trial court made no specific findings in the order changing custody to Father. Looking at the record as a whole, and considering this jurisdiction's fixed policy favoring a stable, permanent home, the judge's decision is contrary to the logic and effect of the facts and circumstances.

### Standard for Modification of Custody—Paternity

██ In decisions involving child custody—whether under the divorce statute or under the paternity statute—the best interests of the child are the primary consideration.[3] *Poret v. Martin* (1982), Ind., 434

---

**3.** Child custody under divorce statute:

IND. CODE § 31–1–11.5–21. *Child custody order Sec. 21. (a) The court shall determine custody and enter a custody order in accordance with the best interests of the child.* In determining the best interests of the child, there shall be no presumption favoring either parent. The court shall consider all relevant factors including:

(1) the age and sex of the child;

(2) the wishes of the child's parent or parents;

(3) the wishes of the child;

(4) the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child best interests;

(5) the child's adjustment to his home, school, and community; and

(6) the mental and physical health of all individuals involved.

\* \* \* \* \* \*

IND. CODE § 31–1–11.5–22 *Investigations and reports*

Sec. 22. Investigations and Reports. (a) In custody proceedings after evidence is submitted upon the petition, if a parent or the child's custodian so requests, the court may order an investigation and report concerning custodial arrangements for the child. The investigation and report may be made by the court social service agency, the staff of the juvenile court, the local probation or welfare department, or a private agency employed by the court for the purpose.

\* \* \* \* \* \*

(d) *The court in determining said child custody, shall make a modification thereof only upon a showing of changed circumstances so substantial and continuing as to make the existing custody order unreasonable. In making its determination, the court shall not hear evidence on matters occurring prior to the last custody proceeding between the parties unless such matters relate to a change of circumstances.*

Child Custody under Paternity Statute:

IND. CODE § 31–6–6.1–11 *Custody; best interest of child, determination*

N.E.2d 885 (divorce); *Griffith v. Webb* (1984), Ind.App., 464 N.E.2d 384 (paternity). In *Griffith v. Webb,* the trial court changed custody of a child from her mother—with whom she had lived for 7 years—to her father. The mother argued on appeal that there was insufficient evidence to show a substantial change in conditions. Judge Hoffman, speaking for the Court of Appeals, 3rd District, upheld the trial court noting the paternity statute, IND.CODE § 31–6–6.1–11(e), does not contain the requirement of finding a substantial and continuing change of circumstances, but only requires the court to consider the best interests of the child. Judge Hoffman observed he could not understand the logic behind the legislature's decision to provide a different standard for custody modifications arising out of paternity actions than for those arising out of divorce situations and suggested this might have "constitutional ramifications". *Id.* at 385. But, in his opinion, only the legislature could change this discrepancy.

In our opinion, *Griffith* did not apply the correct standard of appellate review. In *Griffith,* Amanda was born to Susan Griffith in October 1976. Thomas Webb was adjudged to be the father in 1977. Amanda lived with her mother from birth until June 1983 when custody was changed to her father. In reviewing the trial court's decision, the court stated:

> The evidence in this case demonstrated that both parties wanted custody of Amanda and Amanda exhibited no clear preference. *Rather, she was well adjusted to both families* including her stepmother and half-brother. There was some indication that Susan was not completely in the best of health. She also had a history of instability, particularly

in the area of employment. Whereas, Thomas remained steadily employed and had developed familial ties. Thomas' home was small, but Susan had no home of her own and instead lived with her mother.

> The situation in this action may have presented a "close call" for the trial court. However, in view of the evidence, we cannot say that the trial court's decision constituted an abuse of discretion. We cannot say that the change in custody was not in the best interests of the child, Amanda.

*Griffith, supra,* 464 N.E.2d at 386 (emphasis added).

It is apparent the *Griffith* court did not consider the fact that Susan had raised the child for seven years as an issue or as having any weight—and, consequently, treated the matter as an *initial* custody hearing, not a modification. By finding the child "was well adjusted to both families" and the case was a "close call", the court acknowledged that the decision could have gone either way, which is commonly the case in an *initial custody* determination. *Id.* There was no weight given to the policy or principle that permanence and stability is a paramount consideration when determining whether a *change in custody* is in a child's best interests. The *Griffith* opinion acknowledged the mother was a fit person and did not find the original order *was unreasonable*—and yet allowed the change of custody to stand. In addition, there was no indication in the opinion that the trial court determined the mother to be unfit, that remaining with the mother would be detrimental to the welfare of the child, that there were changed circumstances in mother's custodial situation, or that the continuance of the original custody or-

Sec. 11. *(a) The court shall determine custody in accord with the best interests of the child.* In determining the child's best interests, there shall be no presumption favoring either parent. The court shall consider all relevant factors, including:
(1) the age and sex of the child;
(2) the wishes of the child's parents;
(3) the wishes of the child;
(4) the interaction and interrelationship of the child with his parents, his siblings, and

with any other person who may significantly affect the child's best interest;
(5) the child's adjustment to his home, school, and community; and
(6) the mental and physical health of all individuals involved.

\* \* \* \* \* \*

(e) *The court may modify an order determining custody rights whenever modification would serve the best interests of the child.*

der would be unreasonable. We believe "close calls" occur at initial custody hearings, not at modification hearings. If the *Griffith* decision were correct, shortly thereafter Susan could have petitioned the court showing she had remarried, had a home of her own, the child was adjusted to her new step-father, and—if she could convince a new judge—regain custody. Later, Thomas could petition for a change of custody on a showing he was able to provide a better home than Susan. This could continue so that the child would be switched back and forth numerous times before her emancipation. The effect of the *Griffith* decision is to permit—in paternity situations—a seesawing of custody, a result which our legislature and courts have held to be con-

trary to state policy in a divorce situation. As stated in *Adams v. Purtlebaugh* (1951), 230 Ind. 269, 275, 102 N.E.2d 499, 502:

> It has been a fixed policy of the courts to arrange for custody of children of divorced parents on a basis of permanence to the extent that conditions will permit, providing of course for visiting periods for the parent not having custody. This is on the theory that a permanent residence is best for the welfare and happiness of the child.

 If the phrase "best interests of the child" were not interpreted in the same manner in paternity and divorce situations, then we agree with Judge Hoffman that it might pose constitutional problems.[4] How-

---

4. Our Supreme Court has held that custody of children is an issue warranting equal protection of the law. *Stanley v. Illinois* (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. In *Stanley,* Peter Stanley had lived with, but had not been married to, Joan for eighteen years. They raised three children together. When Joan died, under Illinois law the children became wards of the court and Stanley was not even given notice of the hearing. Stanley appealed claiming he had been denied equal protection under the 14th Amendment. He had not been shown to be an unfit parent, and married fathers and unwed mothers could not be deprived of their children without such a showing. The holding in that case was based on a finding that when a state gives procedural rights to some, but not to all similarly situated, it is constitutionally invalid.

In reaching its decision, Justice White, writing for the majority, discussed the significance and value of custody rights as follows:

> It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements." *Kovacs v. Cooper,* 336 U.S. 77, 95, 69 S.Ct. 448, 458, 93 L.Ed. 513 (1949) (Frankfurter, J., concurring).

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential." *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), "basic civil rights of man," *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and "[r]ights far more precious ... than property rights," *May v. Anderson,* 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose pri-

mary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska, supra,* 262 U.S. at 399, 43 S.Ct. at 626, the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma, supra,* 316 U.S., at 541, 62 S.Ct. at 1113, and the Ninth Amendment, *Griswold v. Connecticut,* 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).

> Nor has the law refused to recognize those family relationships unlegitimized by a marriage ceremony. The Court has declared unconstitutional a state statute denying natural, illegitimate, children a wrongful-death action for the death of their mother, emphasizing that such children cannot be denied the right of other children because familial bonds in such cases were often as warm, enduring, and important as those arising within a more formally organized family unit. *Levy v. Louisiana,* 391 U.S. 68, 71–72, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436 (1968). "To say that the test of equal protection should be the 'legal' rather than the biological relationship is to avoid the issue. For the Equal Protection Clause necessarily limits the authority of a State to draw such 'legal' lines as it chooses." *Glona v. American Guarantee & Liability Ins. Co.,* 391 U.S. 73, 75–76, 88 S.Ct. 1515, 1516, 20 L.Ed.2d 441 (1968).

*Id.* 405 U.S. at 651–652, 92 S.Ct. at 1212–1213.

*Stanley* involved a due process right—opportunity for a hearing—that was denied to him because he was not married to his children's mother. If we apply the reasoning of *Stanley* to our modification statutes, we must find that an unwed custodial parent has the same rights in a modification hearing as a divorced custodial parent. *See Indiana High School Association v.*

ever, under rules for statutory construction our courts must construe statutes, so far as possible, in favor of equality of rights and against restrictions of human liberty and claim of special privilege. *Helms v. American Sec. Co. of Indiana* (1939), 216 Ind. 1, 22 N.E.2d 822. Furthermore, in *Matter of Paternity of Joe* (1985), Ind. App., 486 N.E.2d 1052, 1055, we noted in an extensive footnote that another principle of statutory construction is that statutes relating to the same general subject should be read *in pari materia* and construed together to give effect to the legislature's true intent. *See also, Bauer v. McClure* (1990), Ind.App., 549 N.E.2d 392. In construing the phrase "best interests of the child", we believe it is mandatory that the meaning of the phrase as used in the paternity statute be consistent with the meaning in the related context under the divorce statute.

Under the divorce statute, custody may be modified "only upon a showing of changed circumstances so substantial and continuing as to make the existing custody order unreasonable." I.C. 31-1-11.5-22(d). However, in *Poret v. Martin, supra,* our supreme court interpreted this language as merely a rephrasing of the best interests standard:

> The statute is nothing more than a codification of the case law of this jurisdiction. The words "substantial and continuing," with reference to the change of condition are merely a rephrasing of our case law requirement that it be of a "decisive nature"; and the requirement that it "make the existing order unreasonable" is no different than the case law requirement that the change be "necessary for the welfare of the child."

*Id.* 434 N.E.2d at 888. Even though the paternity statute contains no *codified* requirement that the party petitioning for a change in custody must demonstrate a substantial change in circumstances, we know of no policy reason why the same standard should not be applied. In *Wible v. Wible* (1964), 245 Ind. 235, 196 N.E.2d 571, our supreme court explained the purpose for

*Raike* (1975), 164 Ind.App. 169, 329 N.E.2d 66

demonstrating a changed circumstance as follows:

> There is reason and logic in such a principle of law. The purpose of such a rule in the law is that the welfare of the children and their custody should not continually be changed, and left uncertain, thus creating instability in the living conditions of the children. It is their welfare—not that of the parents—that should be the primary concern of the trial court.
>
> Were the principle with which we are concerned otherwise, *the dissatisfied party could continually harass the other party and the courts with petitions to modify, securing a change of judge and have that particular person as judge again review the facts and the evidence, hoping that such new judge would have a different viewpoint and thus change the custody. That would not put an end to the controversy, for then the other party could immediately file a petition to modify without alleging or showing any change in condition, and get another judge to review substantially the same facts, hoping again that this new judge would have a different viewpoint.* Thus, there would be no end to such litigation were it not for the principle here involved, which required a showing of a substantial change in conditions. In this case there will be no end to the litigation unless that principle is invoked, as we read the evidence and understand the temperament of the parties involved. The welfare of the children is of the first importance in issues of this sort.

*Id.* 245 Ind. at 241-242, 196 N.E.2d at 574. (Emphasis added). Thus, the rationale for requiring a substantial change of circumstances—and the principle that a permanent residence is considered best for the welfare and happiness of a child—should apply to all children whether the parents have been married or not.

### Application

With the correct standard for modification in mind we begin reviewing the

for equal protection analysis.

record. First, Father contends that because Mother did not contest the initial temporary custody order by an interlocutory appeal—instead she requested the matter to be advanced on the court's calendar—that she cannot now appeal the initial temporary custody determination. We need not address that moot issue; nevertheless, we must still examine the situation as it existed prior to the temporary custody order. Temporary custody merely preserves the status quo until a final determination based on all the facts can be made. The order on temporary custody is a provisional order and as such is without prejudice to the rights of the parties or the child. *Pea v. Pea* (1986), Ind.App., 498 N.E.2d 110.[5]

▮ In order to fully analyze whether a change of custody was warranted, we believe it is necessary to set out in detail the facts as revealed by the testimony. Father admitted paternity of the child, a daughter, born on July 7, 1979. On October 5, 1981, the trial court entered its order establishing Father's paternity, changing the child's last name to Chatfield, giving custody to Mother with visitation for Father, and making provisions for support. From 1981 through 1988, Father exercised his visitation rights infrequently. There is conflict in the record as to the reason for his lack of visitation. Both parties agree that the parties did not get along and that visitation, such as there was, was arranged through relatives of the parties. For the first eight years of this child's life, Father had little contact with and showed little interest in maintaining a relationship with the child. Father admitted on cross-examination that after Mother remarried in 1987, he did not get along with Mother's new husband and consequently stayed away in order to avoid a conflict with her new husband. He testified he had not seen the child from the time she was four until she

was eight despite the fact he was granted visitation rights. There was no evidence the paternal grandparents exercised Father's visitation rights during this period.

In December, 1987 the child visited Father during Christmas. There is a dispute as to who arranged this visitation. Mother testified that, after she heard Father was shot at his job as a bouncer, she contacted Father to arrange a visit. Father testified at the January 18, 1988 hearing that he had his sister contact Mother to arrange the visit. Later, at the August 1st hearing, he testified the child called him and asked if she could come visit him. That was the first time he had seen the child in four years. Father again had visitation with the child the weekend of January 8, 1988. It was during this visitation he decided to seek custody.

On January 11, 1988 Father filed a Petition for Temporary Custody, Request for Restraining Order and Vacation of Wage Assignment—without notifying Mother of his intentions. The petition alleged that the child had been "abandoned" by Mother to the custody of her two sisters (two 17-year old twins with babies of their own). The court granted temporary custody to Father in an *ex parte* emergency order.

On January 12, the maternal grandmother, Gladys Walker, and other individuals forcibly removed the child from School # 112, where her Father had enrolled her. Mother was not present when the child was taken and Gladys Walker denied Mother was involved. It is not clear from the record when Mother received notice of the Temporary Restraining Order which was issued on January 11. It is not clear whether maternal grandmother, Gladys Walker, had any knowledge of the order prior to taking the child from school on January 12. When Mother heard from

---

5. In *Pea,* like the present case, the mother had custody initially after the parties' divorce. Later, the father petitioned for modification and restraining order and was granted temporary custody. The child resided with father for one year between the date of the temporary order and final judgment. This court, in reversing the trial court's decision, held that the temporary custody—even for one year—could not be considered as a change of circumstances warranting a modification. The court looked to the circumstances existing prior to the change in temporary custody to determine whether there was a substantial change in the conditions of the custodial home.

Gladys, Mother contacted her attorney, who advised her to return the child to Father. The child was returned to the school the next day, and the child remained in Father's custody thereafter.

On January 12, Mother filed her response and Motion to Advance Cause on the Trial Calendar. On January 14, 1988, Father filed a Motion for Contempt, alleging that the child had been kidnapped from the school at which he had enrolled her, and further alleged that Mother had been involved. On January 22, 1988, after a hearing, the trial court ordered the child left in the temporary custody of Father, but placed with Father's mother, Mrs. Daniels, pending a final determination of the matter. Further hearings were held on June 9, 1988, July 18, 1988 and August 1, 1988 (the court conducted an *in camera* interview with the child on the last date). The trial court entered its final judgment on September 13, 1988 which granted custody of the child to Father, and reasonable visitation to the mother in accordance with Marion County visitation guidelines (every other weekend). The court denied the Father's motion for contempt although the court found and believed that there was complicity by Mother in the actions taken by Gladys Walker in removing the child from school.

At the hearing on January 22, 1988 involving temporary custody, Dr. Aleksic, a psychologist, testified that he had examined the child—at Father's request—on January 15 and 18 shortly after the petition for custody had been filed and after the incident at the child's school. He never interviewed Mother, her new husband or any of her relatives, nor did he visit Mother's home. There is no indication in the record he ever talked with any of the child's teachers. Dr. Aleksic was told by Father the child had been abandoned by Mother and accepted such abandonment as fact. Dr. Aleksic related statements made to him during his interviews with the child. These hearsay statements of the child were allowed (over the objection of Mother's counsel) for the limited purpose of "background" information, not for the truth of the facts asseted in the child's statements.

The child herself never testified. Dr. Aleksic stated he had "reservations" about the child living with Mother. (R. 170). He stated the child may have had a learning problem, was not well disciplined and showed indications of an unstable homelife. He further alleged the child "fears the step-father," suggested there was a "defect" in Mother's attention to the child, and advocated Mrs. Esther Daniels, as a "substitute mothering figure." (R. 185–188). When Dr. Aleksic was asked why placement with paternal grandparents would be better or different from being with the maternal sisters, he responded that Father would have an opportunity to visit the child in an unrestrained way and the child would have more contact with Father. Dr. Aleksic also testified, in his opinion, the child wanted more attention from Mother, but did not show signs of abandonment, or emotional abandonment. When he was asked whether the child should remain with the Father, be returned to the Mother or whether the investigation should be ongoing, he responded, "I think more evidence needs to be gathered.... I think there should be an investigation of Mother's living arrangements for the child because the information I have indicates the child was not in the direct care of the Mother...." (R. 168–169). He did not recommend that custody be permanently removed from Mother, but stated "we need more information about Mother's mothering skill and the household she's operating." (R. 186). Dr. Aleksic did not testify again. The record does not disclose what he meant by further "investigation" or whether he completed an investigation. The only evidence in the record that he was consulted or contacted again after this testimony, was at the final hearing when Father's counsel asked whether the court had received Dr. Aleksic's Addendum of May 12th. Apparently the Addendum was sent to the Domestic Relations Counseling Bureau and was incorporated into the Domestic Counseling Report, but was not entered into evidence and was not a part of this record. There is no indication what information was in the

Addendum or whether it was based on any investigation.

Although the child herself did not testify, her hearsay statements—that she lived with the maternal aunts—were presented by the Father (and were also used as a basis of the opinion of Dr. Aleksic). At the January 22nd hearing, Father testified that when the child visited him at Christmas, she told him she was "living with her aunts, Kaye and Faye." (R. 200). He testified that he investigated and found out from Mother's friends and an unnamed cousin that the child had lived with the aunts for approximately one year. There was no indication in the record that the child told him how long she had been staying with her aunts and Father produced no witnesses to corroborate his allegations based on hearsay.[6] He had no personal knowledge of the home situation and did not talk with the Mother to determine whether the accusations of abandonment were true or false. In fact, he testified he had no objection to Mother or Gladys Walker raising the child, but only objected to Mother's sisters. We note there was no finding or evidence that the sisters were unfit. At the final hearing, Father testified that he had not investigated any further since the January hearing to find any evidence of abandonment. The only testimony of abandonment comes from unsupported hearsay. Additionally, we observe that Father, Mrs. Daniels (Father's mother), and Mrs. Miles, the child's teacher where Father had enrolled her, all testified the child had a tendency to lie. Yet, Father wants to rely on her statements.

Mother testified at the preliminary hearing that she lived at 3516 Salem, Indianapolis, Indiana, where she had lived for three years. She lived in the same home with her mother, brother and her children. One of the children, a son, born September 13, 1983, was from a relationship with her present husband Robert Stone. They were married on August 8, 1987, but had never lived together in one household. Mother

alleged in pleadings that she was uncertain the marriage would last and did not want to subject her children to a move until she was certain it would work out. Stone testified that they were looking for a larger house where the family could live together. However, in the meantime, Mother continued to live with her children in her home—visiting and sometimes staying overnight with Stone at his home. It was during this time when Mother visited Mr. Stone that the child was cared for by Mother's sisters.

Faye Walker, Mother's sister, admitted the child sometimes spent the night at her home, but testified that the child did live with her Mother. Kaye Walker was not allowed to testify. We observe it is not unusual for children to be watched by relatives or to spend the night—or even longer—with relatives or friends from time to time. Louita Williams, the child's teacher during the 1986–87 school year—a portion of the time Father claimed the child was abandoned—testified that the child made progress in the second grade. Williams met with the Mother on several occasions when Mother attended school activities in which the child was involved. The child was not a serious disciplinary problem, was ambitious and wanted to complete her work. Williams also testified the child was always clean, her hair well groomed, and although she did not have a lot of changes of clothes, they were always clean. Rev. Ennis, Pastor of Good Hope Church, testified Mother was a member of the church and that she brought her children to church.

Mother testified that she had worked as a supervisor at Superior Building Services from September 1983 until July 1987. She was laid off and waiting to be recalled. In the meantime, she sold Avon, Tupperware and did babysitting. She testified she received $100 in support from the father of her third child and that she also received support from Stone. Her mother, Gladys,

---

**6.** The Father's allegations that the child told him she was living with her aunts is ambiguous hearsay. We do not know what *the child* meant by "living with her aunts." She could have been staying there temporarily, overnight, or for a week. These ambiguous statements are insufficient to support Father's claim of abandonment.

a private duty nurse, also helped supplement the family budget.

Father testified he worked as a welder with an income of $20,000 per year. At the initial hearing he testified he also worked at a tavern; but, by the final hearing, he had quit that job. He also testified that he was not paying his mother, Mrs. Daniels any support, but would buy things for the child as needed.

The Welfare Department did make home studies on Father and Mother as requested by the court. Gale Waldon–Bray, caseworker, testified that Mother's home was adequately furnished and there was a room at Mother's home for the child, which was shared with her half-sister. She further testified that there was a room with some furnishings for the child at Father's apartment, but the child was only there on weekends. There was no living room furniture at Father's apartment. Father also had another child from a relationship with a former girlfriend. That child was being raised by the child's mother and Father maintained contacts with him. He did not pay regular support for his son, but testified he gave the child's mother money whenever she needed something from him. Father had been living with a woman, Tonya Hurt, since August 1987. They had no children. The caseworker appeared to favor placement with Mother because Mother had an adequate home with appropriate supervision for her children when she was away.

Most of the testimony focused on Daniels as the primary caretaker and substitute mother. In fact, at the final hearing in this matter—when asked about his plans for the child—Father acknowledged the child could live with his mother (Daniels) during the week and he could have visitation on weekends. (In reality, every other weekend due to Mother having visitation.) However, no home study was ever done on Daniels to determine her suitability as a parent substitute. Daniels testified she lived in a four-bedroom unit of a public housing project. She lived there with her husband (an alcoholic), a daughter and her baby, a son, and other grandchildren who stayed with her through the summer. She testified she slept with the child (and her other granddaughters when they stayed the night). Daniels also testified she thought one reason the child "didn't want to stay with her momma" was "she was a little jealous of the other baby" and she felt that "he got more than she did." (R. 408). This other baby was the son of Robert Stone, to whom Mother was married.

There was a child abuse report after the child was placed in grandmother Daniels' household. The investigation was not completed at the time of the final hearing in this matter and there is conflicting testimony in the record. It is possible the child made the accusations in order to be returned home to her Mother. The child did adjust relatively well after being moved to grandmother Daniels' home.

The evidence upon which Father relied was his testimony, Daniels' testimony and the testimony of Dr. Aleksic—whose information was wholly one-sided since he never interviewed Mother, nor did he visit her home. In addition, Mrs. Miles, the teacher from school #112 where Father enrolled the child testified that the child was "pulled in two directions" and "very confused" because of this custody dispute. (R. 356). She further testified that the child told her she wanted to live with her mother. Mrs. Miles had no contact with Mother and could only testify to the welfare of the child after Father obtained temporary custody.

Abandonment has been described as "any conduct by the parent which evinces an intent or settled purpose to forego *all parental duties* and to relinquish all parental claims to the child." *In re: the Adoption of Childers* (1982), Ind.App., 441 N.E.2d 976, 979 (Emphasis added). We find the above testimony to be inconsistent with Father's unsupported claims the child was abandoned. As petitioner, Father had the burden of proving his allegations by a preponderance of the evidence. *Morrison v. Morrison* (1960), 130 Ind.App. 270, 164 N.E.2d 113. In *Morrison*, this court reversed the trial court's order modifying custody of a one year old child. The young mother was given custody by the divorce

decree in March of 1957. Within a few days of the decree, the mother returned to high school to complete her education so that she could better support herself and the child. Without consulting the father, she temporarily placed the child with her aunt and uncle, moral and reputable people, while she returned to school. The father filed for modification of custody based on changed circumstances detrimental to the child. The trial court gave temporary custody to the father, a student at Indiana University, but the child was to reside at the home of his parents. In reversing the trial court, this court observed that there was no "evidence of probative value in the record showing a change of conditions since the last hearing so *vital* as to make it necessary for the welfare of the child that there be any change of custody...." *Id.* 164 N.E.2d at 118. (Emphasis added). Where there is not sufficient evidence to sustain the trial court, the judgment is contrary to law. *Id.* In the present case, because Father failed to prove the child was abandoned, as he claimed in his petition, the matter should have ended there. Father did not amend his petition specifically requesting custody on the basis of a change in conditions. However, assuming the claim of abandonment was sufficient to raise the issue, we review the record for evidence of *any* change warranting a modification.

■ Father asserts that a violation of the restraining order is sufficient to warrant the change in custody. Both parties agree that the judgment changing custody was a general one with no special findings. However, Father suggests that paragraph 6 in the judgment, reprinted below, could be viewed as a special finding:

The Motion For Contempt filed by the Respondent, Terry Dannett Chatfield on January 14, 1988, is hereby denied although, the Court finds and believes that there was complicity by the Petitioner, Gloria Denise Walker in the actions taken by the Petitioner's mother on the date of the alleged incident in the Petition.

Even if we are to accept the court's "finding" that Mother was implicated in the "kidnapping" of the child from her school (she was returned the next day), we do not agree that one-day incident alone is enough to warrant a change in custody from Mother to Father. In *Marshall v. Reeves, supra,* our supreme court held:

[V]iolation of a custody decree alone, nothing else appearing, is not a sufficient basis for modifying a child custody decree for it does not, by itself, establish what will serve as best interest of the child which must always be the paramount concern of the court.

311 N.E.2d at 809–110. Furthermore, "custody of children cannot be used as a means of punishing the parents." *Id.*

■ The record shows a change in father's interest in the child. Our courts have held that a change in the non-custodial parent's lifestyle is not a sufficient basis for a change in custody. *Pribush v. Roy* (1983), Ind.App., 456 N.E.2d 747. We fail to see how a non-custodial parent's renewed interest in his child would be a sufficient change of circumstances warranting a modification.

■ The record supports the conclusion that as of December, 1987, the child may have been troubled about certain aspects of her family relationship in Mother's household, which may have included some jealousy of a younger brother getting regular attention from his father to whom Mother was married. But, jealousy of siblings and unhappiness with parents is common in any family situation. Children of separated parents often believe living with the other parent will make them happier. Here, we have Father's statements the child told him she wanted to live with him. The child told the judge in the *in camera* interview she wanted to live with her Mother *and* her Father. She told Dr. Aleksic she wanted to live with Mother, but did not like her stepfather. Ms. Miles (the teacher at school # 112) testified the child told her she wanted to live with Mother. Despite this conflict over the eight-year-old child's wishes, even if we assume the young child expressed a desire to live with Father, that is insufficient to change custody. *Abair v. Everly* (1959), 130 Ind.App. 192, 163 N.E.2d 34.

Another factor in determining whether this change was in the child's welfare is the interaction and inter-relationship of the child with her siblings.[7] There was no testimony in court regarding the effect of removing the child from contact with her siblings (or the effect on the siblings). However, in *Moutaw v. Moutaw* (1981), Ind.App., 420 N.E.2d 1294, our court reversed a custody modification which separated a child from his siblings where there was insufficient evidence establishing the unreasonableness of the initial custody determination. In reversing, we observed:

> The result, quite obviously, is that the trial judge's Solomonic effort to improve a "somewhat detrimental" situation with respect to the father has succeeded in slicing the family into even smaller fragments than before, separating the son not only from his mother, but from his sisters as well. Presumably, in light of the various activities of the children the son may not even see his sisters for weeks or months at a time under the one weekend per month visitation schedule established by the judge for both the mother and father. How, if at all, such an arrangement is necessary to the welfare of the son and the daughters does not appear in this record.

*Id.* at 1300. *See also, Pribush v. Roy, supra.*

There is testimony of Mrs. Miles which indicates the child was pulled apart and confused by this custody dispute, However, all such testimony related to the time *after* Father initiated this action by filing for temporary custody. We do not believe this confusion of the child after temporary custody was given to Father—though certainly not beneficial—should have been resolved by a change in custody.

If Mother had been found to be unfit, a change of custody would have been warranted. Although we are unable to find significant independent information about the adequacy of her mothering skills, there was no finding that Mother was unfit. The caseworker focused on the adequacy of

Mother's home and child care arrangements, *which were found to be satisfactory.* Mother did offer to go to counseling and to be supervised by the Welfare Department if her child was returned to her. The paternity statute permits the court to order supervision of a placement to insure that custodial or visitation terms of a decree are carried out. *See* I.C. § 31–6–6.1–11(c). This would have been a logical and appropriate option if there were questions regarding the adequacy of Mother's care of this child.

Finally, Mother contends that the trial court's order was, in effect, to place actual custody with the paternal grandparents, the Daniels, with incidental visitation with Father on weekends. The court order provided Mother with visitation according to the Marion County Guidelines of Visitation which means Mother has visitation on alternate weekends. Thus, the child is in effect in the custody, care and control of the paternal grandparents during the week and every other weekend with Father. Even though Father has legal custody, the day to day decisions about the child's welfare are made by Mrs. Daniels. Mother argues that such a transfer was not a transfer of custody between parents, but was in effect a transfer of custody to a third party. She argues, therefore, that a more strict standard of review should be applied in light of the facts of this case. She cites *In re: the Custody of McGuire* (1985), Ind.App., 487 N.E.2d 457, where the trial court determined the mother's parents should receive custody of the child. On appeal, Judge Buchanan recognized that a non-parent—even when seeking to retain existing custody of a child—would bear the burden of overcoming the natural parent's presumptively superior right to custody. Judge Buchanan stated:

> We are not here confronted with a custody dispute between two parents. In such a case, each parent has an equal right to custody and there is no presumption favoring either parent. *See* IC 31–6–6.1–11(a); IC 31–1–11.5–21(a). In this sense, parents are on par with one another and

---

7. I.C. § 31–6–6.1–11(a)(4), (paternity). The same factor is found in the divorce statute, *supra.*

the seminal issue is the best interest of the child. On the other hand, in a custody dispute between a parent and a third party, such as we have here, the focus is significantly different because the parties are not on par. Although the child's best interest is still of great importance, it is *presumed* that it is in the best interest of the child to be placed in the custody of the parent. *Hendrickson v. Binkley* (1974), 161 Ind.App. 388, 316 N.E.2d 376, *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.ED.2d 98. Consequently, a nonparent who seeks to displace the parent as custodian bears the burden of overcoming the parent's presumptively superior right to custody. *Id. This burden has been described to require a showing, by clear and cogent evidence, that the parent is unfit or has acquiesced in or voluntarily relinquished custody to the third party for such a long period of time that "the affections of the child and the third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child.* Id. at 394, 316 N.E.2d at 380. Even when a parent initiates an action to reobtain custody of a child that has been in the custody of another, the burden of proof does not shift to the parent. *Hyatte, supra.* Rather, the burden of proof is always on the third party. *Id.* *McGuire, supra,* at 460–461. (Emphasis added). As was stated in *Hendrickson v. Binkley, supra:*

> If the "best interest rule" was the only standard needed without anything else, to deprive the natural parent of custody of his own child, then what is to keep the government or third parties from passing judgment with little, if any, care for the rights of the natural parents. In other words, a child might be taken away from the natural parent and given to a third party simply by showing that a third party could provide the better things in life for the child and therefore the "best interest" of the child would be satisfied by being placed with a third party.

*Id.* 161 Ind.App. at 396, 316 N.E.2d at 381.

The court's order giving placement to the father was obviously based on the fact that the child would be living with Grandmother Daniels during the week. While the court awarded custody to Father without mention of grandmother Daniels, we must look to the substance and not the form of the order. We find the effect of the order is that the paternal grandparents would raise the child with the parents visiting on alternate weekends. Under the facts of this case, even if we had found some evidence justifying custody to the father—which we have not—we certainly could find no evidence justifying awarding custody to a nonparent.

In summary, the evidence does not support a change of custody from Mother to Father—and, certainly does not support a transfer which is, in effect, to a third party. Father did not show: (1) the child was abandoned; (2) the Mother was unfit; (3) a substantial change in Mother's home occurred which was detrimental to the child's welfare; or (4) the original custody order was unreasonable. We cannot agree that uprooting her from her home and family could be characterized as being "in the child's best interest." We believe it is unreasonable and illogical to allow a noncustodial parent in a paternity situation to utilize the system to make unfounded allegations and thereby obtain a review of what placement would be in the "child's best interests". We do not allow that to occur when parties have been divorced and we see no reason to permit parents to do so when they were never married.

We regret that our decision here means that this child will be moved again from a home where she may have adjusted well. However, for all of the above reasons, we find the trial court abused its discretion and its decision must be reversed. This matter is remanded to the trial court for entry of an appropriate support order.

ROBERTSON and CONOVER, JJ., concur.