Allen J. DAUGHERTY and Ruth
E. Daugherty, Appellants–
Petitioners,

v.

Deanna RITTER, Appellee–Respondent.

No. 27A02–9402–CV–65.

Court of Appeals of Indiana,
Second District.

Jan. 30, 1995.

David Glickfield, Jr., Glickfield, Glickfield
& Glickfield, Marion, for appellant.

P. Robert Dawalt, Jr., Marion, for appellee.

## OPINION

KIRSCH, Judge.

### STATEMENT OF THE CASE

Allen and Ruth Daugherty appeal from the trial court's denial of their petition for visitation with their granddaughter, Jessica. The Daughertys raise five issues which we consolidate and restate as follows: Did the trial court abuse its discretion when it denied the Daughertys' petition for visitation?

We affirm.

### FACTS AND PROCEDURAL HISTORY

On March 8, 1987 Jessica was born out of wedlock to Deanna Ritter. Paternity for Jessica was never established. At the time of Jessica's birth, Deanna resided with her parents, the Daughertys.

After Jessica's birth, Deanna and Jessica temporarily resided with Deanna's sister and brother-in-law, Cathy and Robert Breedlove, but moved into the Daughertys' new home where they continued to reside for the next four years. Because Deanna was going to school and working part-time, the Daughertys spent considerable time caring for Jessica.

Deanna married Charles Ritter in January of 1992 and moved, together with Jessica and Charles, into a new home. For some time, the Daughertys visited Jessica at her home on alternate weekends but last visited Jessica on March 8, 1992, her fifth birthday.

The relationship between the Daughertys and Deanna and Charles soon became strained, at least in part, because the Daughertys believed Deanna and Charles were unfairly denying them the opportunity to visit Jessica. Tensions also escalated through a

variety of incidents. On one occasion, Mr. Daugherty came to the Ritter household one morning and began yelling and pounding on the doors and windows of the house, claiming that it was his weekend to exercise visitation. The argument ended with Mr. Daugherty saying that he was going to "get together" with Charles' ex-wife to "ruin" Charles' life. *Record* at 160. Later that day or soon after, Mrs. Daugherty came to Deanna and Charles' home and shouted that Charles and Deanna had hurt Mr. Daugherty. Charles and Deanna asked her to leave; Mrs. Daugherty refused, and Deanna and Charles called the police. Jessica witnessed this confrontation.

Tensions also escalated when Charles faced battery charges filed by his ex-wife. Allen attended the trial, saying he was there "in support of [Charles'] ex-wife [because] [s]he is a friend of mine." *Record* at 95. Frequent bickering and name-calling has also occurred, with the Daughertys calling Charles a "son of a bitch" and a "child molester" on at least one occasion.

In an effort to mend the strained relationship, Charles invited the Daughertys to Jessica's fifth birthday party. Charles asked them to come alone, requesting they not tell other family members about the party so the Ritters and Daughertys might have a better opportunity to work out their differences. A few minutes after the Daughertys arrived, other family members began to arrive, however, apparently at the direction of the Daughertys. The party broke up minutes later with no reconciliation having occurred.

On July 1, 1993, the Daughertys filed their petition for visitation. After conducting a hearing, the trial court denied the petition and the Daughertys now appeal.

### DISCUSSION AND DECISION

■ The Daughertys make two arguments: First, they contend the trial court, in reaching its decision, was required to consider the relationship they had with Jessica. Second, they argue that the grandparent/grandchild relationship ought to be given more weight than other factors in determining whether grandparent visitation is in the best interests of the child.

Grandparent visitation rights are conferred by statute in Indiana pursuant to the Grandparent's Visitation Act (Act). *See* IC 31–1–11.7–1 *et seq.* Section 2 of the Act provides:

"A child's grandparent may seek visitation rights if:

(1) the child's parent is deceased;

(2) the marriage of the child's parents has been dissolved in Indiana; or

(3) the child was born out of wedlock."

The Daughertys have standing to seek visitation under subsection three of the Act.

■ The legislature has provided that visitation rights may be granted when the court finds it to be in the best interests of the child. IC 31–1–11.7–3(b); *In re Marriage of Weddel* (1990), Ind.App., 553 N.E.2d 213. The legislature further provided that in determining the best interests of the child, the court may consider whether a grandparent has had, or has attempted to have, meaningful contact with the child. IC 31–1–11.7–3(b). Determining the best interests of the child is committed to the sound discretion of the trial court and will be reversed on appeal only upon a showing of an abuse of that discretion. *Walker v. Chatfield* (1990), Ind.App., 553 N.E.2d 490, 493. An abuse of discretion exists where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court or the reasonable, probable deductions to be drawn therefrom. *Id.* We will not reweigh the evidence or judge the credibility of the witnesses. *Id.*

■ Because the Daughertys had the burden of proof at the trial court, they appeal from a negative judgment. *Buckland v. Reed* (1994), Ind.App., 629 N.E.2d 1241, 1245. A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion different from that reached by the trier of fact. *Id.* We will reverse a negative judgment only if the decision is contrary to law. *Id.* In examining whether the trier of fact's decision is contrary to law, we must determine whether the undisputed evidence and all reasonable inferences to be drawn therefrom lead to but one conclusion and the trier of fact has reached a different one. *Id.*

When the Daughertys argue that the trial court was required to consider the contact they had with Jessica, they ignore the plain language of the Act which makes consideration of such contact purely discretionary: "In determing [sic] the best interests of the child under this section, the court *may* consider whether a grandparent has had, or attempted to have, meaningful contact with the child." IC 31-1-11.7-3(b) (1992 Supp.) (emphasis added). Although a trial court should ordinarily consider such contact as one of the factors in determining whether visitation is in the best interests of the child, the use of the permissive "may" clearly indicates it is not required to do so.

The Daughertys' argument that contact between the grandparent and the grandchild ought to receive greater consideration than other factors in determining the issue of grandparent visitation also misconstrues the Act. Prior to 1993, the Act clearly stated that grandparents could not obtain visitation against the wishes of the custodial parent.[1] In 1993, however, the legislature amended the Act and deleted this prohibition, thus expanding a grandparent's right to seek visitation with a grandchild. In view of the specific changes in the Act, the legislature contemplated the possibility that under certain circumstances visitation could be granted notwithstanding dissension between the custodial parent and grandparent. The legislature's deletion of the Act's previous prohibition, however, does not support the inference that contact between the grandparents and the grandchild should receive greater weight in the best interest analysis. The amendment to the Act merely confers standing upon grandparents who wish to exercise visitation but whose efforts are being blocked by the custodial parent. Put differently, the wishes of the custodial parent now no longer serve as an automatic bar against parties, like the Daughertys, who wish to exercise visitation. Nothing in the Act, however, suggests that grandparents who now have standing to petition for visitation carry a presumption in favor of visitation being granted simply because they have, or have attempted to have, contact with the grandchild. *See* IC 31-1-11.7-3(b) (1992 Supp.). Similarly, the Daughertys argue that because no evidence showed that the family contact had a negative effect on Jessica, evidence showing the positive effects of their relationship with Jessica ought to outweigh the evidence showing family strife. The Daughertys essentially ask us to reweigh the evidence, a role reserved exclusively for the trier of fact. *See Walker*, 553 N.E.2d at 493. Because the court had before it evidence of extensive family conflict, it could have reasonably concluded that it was not in Jessica's best interest for the Daughertys to exercise visitation with her.

In *Moses v. Cober* (1994), Ind.App., 641 N.E.2d 668, this court stated that the focus of the trial court in determining issues of grandparent visitation should be on the relationship between grandparent and grandchild. That focus, however, is the starting point, not the ending one, in the trial court's best interest analysis. The ultimate question is whether visitation in the face of family discord is in the child's best interest. That question can only be answered by looking at the totality of the circumstances presented. While the relationship may, in any given case, be sufficient to make grandparent visitation in the child's best interest, notwithstanding the dissension between the parent and grandparent, it may not be sufficient to overcome the effects of the discord on the child in another. That difficult determination is left to the wisdom and the discretion of the trial court.

The trial court did not abuse its discretion nor was its ruling contrary to law.

**Affirmed.**

SHARPNACK, C.J., and SULLIVAN, J., concur.

---

1. Prior to its amendment, the Act included the following provision:

   "(a) A court may not grant visitation under this chapter after May 8, 1989, to a grandparent who is the parent of a person:

   (1) who is not deceased; and
   (2) who has been awarded custody of the grandchild."