Linda D. JOE, Appellant–Respondent,

v.

Robert F. LEBOW, Appellee–Petitioner.

No. 49A02–9504–JV–189.

Court of Appeals of Indiana.

July 18, 1996.

Russell T. Clarke, Jr., Indianapolis, for appellant–respondent.

Vicki L. Anderson, Indianapolis, for appellee–petitioner.

**OPINION**

SULLIVAN, Judge.

In this case arising from a prior determination of paternity, Linda D. Joe (Mother) appeals the order of the trial court granting the petition of Robert F. Lebow (Father) for modification of custody of their daughter,

N.D.L., and awarding Father permanent custody.

Mother presents the following issues, as restated and reordered, for our review:

I. Whether the recently-revised statutory provision addressing custody modification in the paternity context should be interpreted to incorporate the standards applied in the former statutory provision addressing custody modification in the dissolution context;

II. Whether the trial court erred in considering evidence concerning improvement in N.D.L.'s condition during the period when Father had temporary custody of N.D.L. pending resolution of his petition;

III. Whether the evidence was sufficient to sustain the trial court's order modifying custody and awarding custody to Father; and

IV. Whether the trial court improperly placed the burden of proof upon Mother to demonstrate changes within the custodial home?

We affirm.

Shortly after N.D.L.'s birth on January 12, 1983, Father filed a petition to establish paternity. The parties stipulated to Father's paternity of N.D.L., and Father did not object to Mother having legal custody. The parties did, however, dispute the issue of visitation by Father, and the issue was litigated before a Special Judge, who entered an order granting Father visitation for two weeks out of each month. The Special Judge granted Father such frequent visitation despite the fact that, during the pendency of the litigation, Mother moved from Indianapolis, where Father resides, to Maryland, in order to undertake a medical fellowship. Ultimately, the case was appealed to this court, which in 1985 reversed the Special Judge's visitation order.[1] Thereafter, the visitation issue was mediated, and an agreed-upon schedule was approved by Judge Payne on November 3, 1986. Pursuant to this schedule, Father had visitation with N.D.L. for two separate three-week periods in the summer, for five days at Thanksgiving, from

---

1. *See In re Paternity of Joe* (1985) Ind.App., 486 N.E.2d 1052. Although the caption of that appeal is as shown, the text of the opinion reflects that the surname of the child is Lebow.

Christmas to somewhat after the new year, and over N.D.L.'s spring break. Mother and Father apparently honored the terms of this schedule without significant conflict until 1994.

N.D.L., who continued to reside with Mother in Maryland through 1994, was born with a number of health problems, including a spinal neurological degeneration which was thought at birth to be progressive, but which at some point stabilized. She also suffers from scoliosis, which necessitated major surgery in 1992 to correct a sixty-degree curvature in her spine and resulted in her thereafter being in a body cast for three months. N.D.L. also suffers from an undefined learning disorder which causes her to transpose words and have difficulty "finding words" when she is speaking. Record at 354. To assist her in overcoming her learning and speech difficulties, Mother placed N.D.L. at an early age into a special educational program, which culminated in N.D.L.'s gradual mainstreaming into the general educational population in the third grade. Further, to provide assistance in overcoming her physical challenges, N.D.L. received physical therapy until kindergarten.

During his first three-week summer visit with N.D.L. in 1994, Father developed serious concerns regarding N.D.L.'s condition. N.D.L. had always been an obese child, and as early as summer 1993, Father had placed N.D.L. on a calorie-restricted diet during his first visitation with N.D.L., which resulted in her losing ten pounds over the three-week period. When N.D.L. returned for her second 1993 summer visitation, however, she had, according to Father, "gained the ten pounds back plus some." Record at 284. Further, when N.D.L. returned for her visitation with Father in summer 1994, she weighed 194 pounds, fully forty pounds heavier than she had been in the summer of 1993. Father was particularly concerned that about twenty pounds of the weight gain had occurred between N.D.L.'s visit with him during her 1994 spring break in April and her first visit in July 1994, a period of less than three months. Father also observed during the first summer 1994 visit that N.D.L. appeared depressed and expressed

unhappiness with her life in Maryland. N.D.L. specifically claimed that she was alone for significant periods of time at night before Mother returned from work and frequently had to make her own meals. N.D.L. also stated that she wanted help losing weight.

Based upon his observations of N.D.L.'s physical and emotional condition, Father took N.D.L. in July 1994 to see Dr. Philomena Dias, a pediatrician and specialist in adolescent medicine. Dr. Dias diagnosed N.D.L. as being morbidly obese and suffering from high blood pressure. Dr. Dias described N.D.L.'s forty-pound weight gain over the course of one year as "dramatic" for a child of N.D.L.'s age. Record at 151. Further, during a psychological screening described by Dr. Dias as routine practice in adolescent medicine, N.D.L. revealed that she was depressed and expressed thoughts of suicide or self-harm.

While Dr. Dias was concerned by N.D.L.'s expression of suicidal thoughts, she did not feel that N.D.L. was at a stage where she was likely to act on her thoughts, since N.D.L. did not have an organized plan for suicide or self-harm. Further, N.D.L. was scheduled to go on a vacation with Mother shortly after the medical exam, and was looking forward to the trip. Dr. Dias stated that, since vacations are natural "stress relievers," and since N.D.L. would be supervised by Mother throughout the trip, she felt it would be acceptable for N.D.L. to return to Mother in order to go on the vacation, so long as appropriate arrangements were made for counseling upon N.D.L.'s return to Indianapolis, which was to occur right after the vacation with Mother was completed.

Shortly after N.D.L.'s return to Indianapolis in August 1994, Dr. Dias again examined N.D.L.. N.D.L. stated that she was still depressed, and had been "unable to connect with her mom" while on the trip. Record at 132. Dr. Dias also observed that N.D.L. had developed a problem with shortness of breath which had not appeared during the July exam. N.D.L. told Dr. Dias that she did not wish to return to Maryland with Mother, and that she felt "really alone and isolated" while in Mother's care. Record at

136. Shortly after the August exam, Dr. Dias contacted Mother and reported her concerns about N.D.L.'s depression and suicidal thoughts. Mother was unaware of N.D.L.'s depression or suicidal thoughts, and thus had not instituted treatment for this problem. Further, Mother testified that she was unaware of N.D.L.'s forty-pound weight gain over the past year, and N.D.L.'s pediatrician in Maryland, who had not seen N.D.L. for a year, was not treating her for a weight problem. Mother did testify that she was aware that N.D.L. had a general weight problem, which was being addressed with "a regiment [sic] of mild diet restriction and lots of activity as much as she would tolerate." Record at 383.

Dr. Dias referred N.D.L. in August to Marsha Goldfarb, a clinical social worker, for further evaluation of N.D.L.'s depression. Ms. Goldfarb met with N.D.L., who reported that she felt "a sense of extreme loneliness" while living with Mother. Record at 159. N.D.L. stated that, although she would not act upon her thoughts of self-harm or suicide, she had those thoughts on a daily basis. N.D.L. reported a very negative self-image, which stemmed in part from teasing she received at school due to her weight, and in part from her sense of loneliness and isolation at home. N.D.L. reported to Ms. Goldfarb that she was often left home alone late, sometimes until ten or eleven o'clock at night. It was soon learned, however, that N.D.L. had in fact exaggerated the amount of time she was left alone, since Mother usually returned home from work before seven o'clock, and employed houseworkers to look after N.D.L. until she arrived home.

Ms. Goldfarb opined that N.D.L.'s embellishment of the amount of time she was alone was motivated by her "need to have other people understand how lonely she felt. Whether or not she was actually alone all that time or not, her perception was that she was alone far too much and needed some other connection or nurturing or watching over her." Record at 163. When specifically asked whether Mother was meeting N.D.L.'s emotional needs, Ms. Goldfarb responded in the negative, based on N.D.L.'s "sense of isolation". Record at 174. Ms. Goldfarb also

stated, in response to being asked whether N.D.L. had difficulty relating to Mother, that "there is an area where [N.D.L.] is afraid to risk perceived rejection from her mother. If [N.D.L.] said something her mother [did] not like, that could have negative consequences to [N.D.L.]." Record at 175. Ms. Goldfarb concluded that N.D.L. required immediate intervention or counseling, and recommended that N.D.L. not return to Maryland.

Based upon his observations of N.D.L., along with the reports of Dr. Dias and Ms. Goldfarb, Father filed a "Verified Emergency Petition for Temporary Custody" of N.D.L. on August 19, 1994, attaching an affidavit of Ms. Goldfarb attesting, in relevant part, to the results of her examination of N.D.L. indicated above. Judge Payne granted the petition on August 20 and set a date for a permanent custody hearing. The hearing, which was originally scheduled for September 27, was held on December 6 and 13, 1994.

Prior to the hearing, Dr. John Ehrmann, a clinical psychologist, performed a custody evaluation of N.D.L., Mother, and Father. Dr. Ehrmann testified that N.D.L.'s interaction with both Mother and Father was good and provided evidence of solid emotional bonding with both parents. Further, Mother and Father both took a psychological test, from which Dr. Ehrmann concluded that neither had evidence of inability to meet N.D.L.'s emotional needs.

Dr. Ehrmann also interviewed N.D.L., both by herself and in the presence of Mother and Father separately. When speaking with Dr. Ehrmann alone, N.D.L. repeated much of what she had said to Ms. Goldfarb about being alone when she left for school in the morning, often until late at night, and having to fix her own meals. However, when Dr. Ehrmann interviewed N.D.L. in Mother's presence, N.D.L. acknowledged that she was not in fact alone late at night, and that she often fixed her own meals because she did not like what the housekeeper fixed for her. N.D.L. also admitted that Mother in fact was not often at work until late at night. Nonetheless, N.D.L. reiterated "her feeling of being separate from her mother and from not having as much or anywhere as much inter-

action or contact with mother." Record at 219–20. N.D.L. also stated, in Mother's presence, that she wished to remain and live with Father.

On cross-examination, Dr. Ehrmann was asked whether it was unusual for a parent not to know of a child's depression. He responded that, while it was clear that N.D.L. had not been forthcoming in sharing her feelings with Mother, "a parent that is really focused on and concerned about a child would pick up on some of the apparent degrees of sadness and or depression that was there and pursue that." Record at 248. In response to the question whether he felt Mother had allowed N.D.L. to become obese, while acknowledging that it would be "inappropriate" to concluded that Mother had been "grossly negligent", Dr. Ehrmann said that, "in some ways [Mother] was not there present enough or in other ways frustrated herself by [N.D.L.'s] again passive aggressive behavior.... We have acknowledgment that in essence [N.D.L.] chose her own breakfast, lunch and dinner much of the time. It is that combination, again tied in with the lack of exercise and a lack of efforts to burn off calories like most normal children this age do that has resulted in this obesity." Record at 254. While Dr. Ehrmann acknowledged that N.D.L. had exhibited manipulative behavior in exaggerating the amount of time she was alone, he felt that at "an emotional level this child in regard to her relationship with [Mother] did feel abandoned". Record at 252. Dr. Ehrmann concluded that it would be in the best interests of N.D.L. to remain with Father.

Interwoven through the testimony of all three expert witnesses (Mother did not offer expert testimony), was evidence of changes in N.D.L.'s condition while in Father's care. Dr. Dias testified that, under her supervision, Father had placed N.D.L. on a calorie-restricted diet, which had resulted in her losing approximately fourteen pounds as of November 1994. Dr. Dias further testified that, while it is not recommended that a child undergo rapid weight loss, this was an acceptable rate of weight loss for N.D.L.[2] Dr. Dias added that N.D.L.'s blood pressure had returned to normal levels while in Father's care. Finally, Dr. Dias testified that N.D.L. had improved her movement, that her "affect" was better, and that her mood seemed better with Father. Record at 140.

Ms. Goldfarb, who continued to counsel N.D.L. while in Father's custody, testified that N.D.L.'s mood had improved and her depression had lessened while in Father's custody. Based upon N.D.L.'s reports, as well as Ms. Goldfarb's observation of N.D.L. at school, Ms. Goldfarb also testified that N.D.L. appeared to have improved socially. Further, N.D.L. no longer expressed thoughts of self-harm to Ms. Goldfarb.

Dr. Ehrmann testified that N.D.L. reported to him that Father had provided more assistance with her diet. He also observed that, although he expressed doubts about the depth of N.D.L.'s thoughts of self-harm, she did not have those feelings while in Father's custody. Finally, he observed that her general emotional status appeared to have improved, and he noted that N.D.L. "smiles readily, seems very comfortable and very happy and continues to make statements

---

**2.** We observe that Mother has misstated Dr. Dias' testimony in this regard. Mother states in her brief that, "Dr. Dias considered [N.D.L.'s] weight at 175 pounds to be an acceptable weight for a child of [N.D.L.'s] age." Br. of Appellant at 6–7. In fact, examination of the record at the point cited by Mother reveals that, as stated textually, Dr. Dias said that N.D.L.'s *rate* of weight loss which led her to be 175 pounds in November was acceptable. Dr. Dias never stated or implied that 175 pounds was an acceptable weight for N.D.L. In fact, it is obvious from the record that N.D.L.'s diet while in Father's care has been an ongoing process.

We point this out not in order to isolate one passage from what is an otherwise well-written brief (indeed, both Mother and Father have presented well-researched and coherent arguments on appeal), but simply because, as will be discussed *infra*, the extent to which N.D.L.'s condition improved in Father's care is disputed in this case, and Mother seeks to utilize her misstatement of Dr. Dias' testimony to undermine the conclusion that N.D.L.'s weight and health improved while in Father's care. *See* Br. of Appellant at 31–32 ("[T]he testimony that at 190 pounds the child was morbidly obese, but at 175½ pounds she is at an acceptable weight simply defies logic for an eleven or twelve year old child.").

about enjoying it here and wanting to remain here." Record at 226.

Father provided testimony concerning his reasons for seeking custody of N.D.L.. He stated that he had sought custody primarily because of his concern about N.D.L.'s rapid weight gain over the year immediately preceding his petition, which left her "enormously morbidly obese". Record at 258. Father testified that, in his medical opinion (both Mother and Father are medical doctors), the weight gain was such that it was endangering N.D.L.'s life. Father was also concerned that the weight gain would aggravate N.D.L.'s other physical problems, as well as contribute to her low self-esteem. Father also testified to the steps he was taking, with Dr. Dias' assistance, to assist N.D.L. in bringing her weight down, and he testified that N.D.L. was continuing with speech therapy to assist her in overcoming her linguistic problems.

Mother testified that she was aware of N.D.L.'s weight problem, and had instituted a semi-restricted calorie diet to address it. She was not, however, aware of N.D.L.'s forty-pound weight gain over the course of the previous year. Mother testified that, contrary to N.D.L.'s earlier assertions, she got home from work "in the ball park of six or seven, maybe a little bit later on the average." Record at 359.

Additional facts will be recited where deemed appropriate.

## I.

Father filed his petition for custody modification on August 19, 1994. Effective July 1, 1994, the statutory provisions governing modification of custody in both the paternity and the dissolution contexts were revised, so that their language, which had been significantly different, is now identical. Mother and Father both contend that the standard for modification of custody is now the same whether the modification issue arises in the dissolution or the paternity context. Mother argues, however, that the revised modification statutes must be construed to apply the presumptions and principles which had been applied under the former standard for modification of custody in the dissolution context. Father counters that, in revising the statutes, the legislature deleted certain language found in the former dissolution custody modification statute, and he argues that this deletion demonstrates the legislative intent that the prerequisites to modification embodied in that deleted language no longer apply in either the dissolution or the paternity context. Thus, to fully resolve whether the revised modification statute applicable in the paternity context should be interpreted to incorporate the presumptions and principles from the former dissolution modification statute, it is necessary that we examine the revisions to both the dissolution and the paternity modification statutes.[3]

### A. Statutory Background

Custody determinations in the paternity and the dissolution contexts are governed by separate statutory provisions. See I.C. 31–1–11.5–21 to –22 (Burns Code Ed. Supp.1995) (dissolution); I.C. 31–6–6.1–11 (Burns Code Ed. Supp.1995) (paternity). With respect to initial custody determinations, the paternity and dissolution statutes contain virtually identical language requiring the initial determination to be made based on "the best interests of the child." I.C. 31–1–11.5–21(a); I.C. 31–6–6.1–11(a). Both provide that there is to be no presumption favoring either parent, and direct the court to consider "all relevant factors", including:

(1) The age and sex of the child;

(2) The wishes of the child's parent or parents;

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) The interaction and interrelationship of the child with his parent or parents, his

---

3. To date, the revised statute pertaining to custody modification in the dissolution context has been applied in two published cases. See Van Schoyck v. Van Schoyck (1996) Ind.App., 661 N.E.2d 1, trans. denied; and Doubiago v. McClar- ney (1995) Ind.App., 659 N.E.2d 1086, trans. denied. The revised statute pertaining to paternity has not yet been applied in a published opinion.

siblings, and any other person who may significantly affect the child's best interests;

(5) The child's adjustment to his home, school, and community; and

(6) The mental and physical health of all individuals involved. I.C. 31–1–11.5–21(a); *see* I.C. 31–6–6.1–11(a).[4]

Thus, in making an initial custody determination, a court considers the same factors whether the custody issue arose out of a paternity or a dissolution action. *See In re Paternity of Joe* (1985) Ind.App., 486 N.E.2d 1052, 1055 n. 1

Prior to 1994, however, the paternity and dissolution custody statutes contained very different language governing modification of custody, and thus different standards governed modification petitions, depending upon whether the petition arose from a paternity determination or a dissolution of marriage. In the paternity context, modification was governed by the former I.C. 31–6–6.1–11(e), which permitted modification "whenever modification would serve the best interests of the child." *See In re Paternity of Seifert* (1993) Ind.App., 605 N.E.2d 1202, 1206, *trans. denied.* Conversely, modification of custody arising from a dissolution of marriage was governed by the former I.C. 31–1–11.5–22(d), which permitted modification only "upon a showing of changed circumstances so substantial and continuing as to make the existing custody order unreasonable." *See Herrmann v. Herrmann* (1993) Ind.App., 613 N.E.2d 471, 473, *reh'g denied.*

The difference between these two standards was significant. Under the "changed circumstances" test, in order to warrant modification of the existing custody order, the parent seeking modification was required to make the following showing:

"[T]he changed circumstances must be of a decisive nature and the modification must be necessary for the welfare of the child or children involved, or there must have been a change in the treatment of the children in the custodial home which necessitates removal. Only a strict showing that the

present arrangement is unreasonable will suffice to justify a change in custody because of the potentially disruptive influence upon the child or children." *Winderlich v. Mace* (1993) Ind.App., 616 N.E.2d 1057, 1059, *reh'g denied* (citations omitted).

Conversely, in the paternity context, the parent seeking modification was not required to make any showing of changed circumstances, so long as the parent could demonstrate that the modification was in the child's best interests. *In re Seifert, supra*, 605 N.E.2d 1202, 1206. The parent seeking modification was not required to demonstrate that the change was "necessary for the welfare of the child" or that the existing order was "unreasonable". *See In re Grissom* (1992) Ind., 587 N.E.2d 114, 116.

That a more stringent standard was applied to modifications arising in the dissolution context appears to have been due at least in part to the fact that custody issues arising from dissolution proceedings have generated a longstanding and sizeable body of caselaw, much of which predated the adoption of the statutory modification standard. *See, e.g., Marshall v. Reeves* (1974) 262 Ind. 107, 311 N.E.2d 807; *Mikels v. Mikels* (1967) 248 Ind. 585, 228 N.E.2d 20; *Wible v. Wible* (1964) 245 Ind. 235, 196 N.E.2d 571; *Adams v. Purtlebaugh* (1951) 230 Ind. 269, 102 N.E.2d 499. Thus, at the time the statutory standard was to be interpreted, it was interpreted in light of the caselaw already existing. As our supreme court stated in *Poret v. Martin* (1982) Ind., 434 N.E.2d 885:

"The statute [I.C. 31–1–11.5–22(d) ] is nothing more than a codification of the case law of this jurisdiction. The words 'substantial and continuing,' with reference to the change of condition are merely a rephrasing of our case law requirement that it be of a 'decisive nature'; and the requirement that it 'make the existing order unreasonable' is no different than the case law requirement that the change be 'necessary for the welfare of the child.'" 434 N.E.2d at 888.

In the paternity context, however, our supreme court specifically rejected any attempt

---

4. The enumerated factors are different only in that the paternity provision speaks of the child's "parents", while the dissolution provision speaks of the child's "parent or parents".

to interpret the modification statute in light of the policies applicable to modifications in the dissolution context.[5] In *Walker v. Chatfield* (1990) Ind.App., 553 N.E.2d 490, this court had determined that, notwithstanding the difference between the paternity and dissolution statutes, the "substantial and continuing change" standard should apply in the paternity as well as the dissolution contexts. 553 N.E.2d at 495–96. The supreme court specifically disagreed with *Walker,* however, and vacated an opinion of this court applying the *Walker* standard in *In re Grissom, supra,* 587 N.E.2d 114. In *Grissom,* the supreme court specifically observed that "the statutes contain different standards", and held that the more stringent "substantial and continuing change" standard was inapplicable to paternity cases, for which modification of custody was to be determined solely under the "best interests" standard. 587 N.E.2d at 116.

Thus, prior to 1994, the issue of the difference between the modification standards had been addressed by both this court and our supreme court. A longstanding body of caselaw had been developed in the dissolution context, and the dissolution modification statute had been interpreted in light of the policies expressed in these opinions. In paternity situations, however, the supreme court made it clear that the modification provision was not to be interpreted in a manner similar to the dissolution provision. It is in this context that we examine the 1994 amendments to both statutes.

### B. The 1994 Amendments

Effective July 1, 1994, the modification provisions in both the paternity and the dissolution statutes were revised significantly, so that they now contain virtually identical language. In revising the modification provisions, however, the legislature did not adopt *in toto* either the "substantial and continuing

change" language from the former dissolution provision or the "best interests" language from the paternity provision. Both were revised to read as follows:

"The court may not modify a child custody order unless:

(1) It is in the best interests of the child; and

(2) There is a substantial change in one (1) or more of the factors which the court may consider under [the provision enumerating factors relevant to determining the best interests of the child]" I.C. 31–1–11.5–22(d); 31–6–6.1–11(e) (Burns Code Ed. Supp.1995).

Further, both provisions now contain language specifying that, when considering a petition for modification of custody, trial courts are to consider the enumerated factors pertaining to the best interests of the child. I.C. 31–1–11.5–22(e); 31–6–6.1–11(f).

▮ Our task in this case is to interpret the revised modification standard applicable to paternity cases. We begin, however, by registering our agreement with both parties that the 1994 revisions evince the clear intent of the legislature to equalize the standard between dissolution and paternity cases. The language of the two provisions, which had been quite distinct, is now identical, and we seek to interpret language consistently throughout related statutory provisions. *See Citizens Action Coalition v. Northern Ind. Pub. Serv. Co.* (1985) Ind., 485 N.E.2d 610, 617, *cert. denied* (1986) 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (citing 26 I.L.E. *Statutes* § 117); *see also Habig v. Bruning* (1993) Ind.App., 613 N.E.2d 61, 64, *trans. denied* ("As the legislature chose the same language for both statutes, we are compelled to conclude it had the same intent in enacting the respective provisions and we must interpret both statutes in the same manner.") Further, cases discussed in Section A *supra*

---

**5.** This court had first expressed reservations about the differing standards in *Griffith v. Webb* (1984) Ind.App., 464 N.E.2d 384, which arose from a paternity action. In *Griffith,* this court affirmed the trial court's decision changing custody based upon the "best interests" standard. In so doing, however, the panel observed that it was "unclear as to the logic behind the [l]egislature's decision to provide differently for custody

modifications arising out of paternity actions than those arising out of marriage dissolution actions". 464 N.E.2d at 385. Nonetheless, the panel observed that the different standards appeared to have been the product of "a deliberate effort" by the legislature, and it urged the legislature to "perhaps examine this discrepancy and the possible constitutional ramifications thereof". *Id.*

in which both this court and the supreme court specifically noted the difference between the standards, and in at least one case specifically invited legislative action to address this issue, provide ample support for the conclusion that the legislature was aware of the discrepancy between the dissolution and paternity standards, and we may therefore assume that an enactment of the legislature changing a statute was a response to the interpretation placed upon that statute by the appellate courts of this state. *Huff v. Biomet, Inc.* (1995) Ind.App., 654 N.E.2d 830, 834; *In re Estate of Waltz* (1980) Ind.App., 408 N.E.2d 558, 560. Thus, we hold that the standard for modification of custody under the revised statutory provisions is the same whether the modification petition arises out of a dissolution action or a paternity action.[6]

■ It is the extent to which the revised standard should be interpreted to incorporate principles developed under the former dissolution standard, however, which we must determine, and to do so, we employ well-recognized tools of statutory construction. As always, our objective in construing a statute is to determine the intent of the legislature. *Guzman v. AAA Auto Rental* (1995) Ind.App., 654 N.E.2d 838, 840; *Smith v. State ex rel Medical Licensing Bd.* (1985) Ind.App., 459 N.E.2d 401, 404. Our primary tool for determining legislative intent is the language of the statute itself. *Y.A. by Fleen-er v. Bayh* (1995) Ind.App., 657 N.E.2d 410, 416. We do not read statutes in isolation, however, and we consider the language and structure of the entire statutory scheme, as well as changes made to the statutory scheme over time. *Indiana State Police Dep't v. Turner* (1991) Ind.App., 577 N.E.2d 598, 601, *trans. denied; Daugherty v. State* (1984) Ind.App., 466 N.E.2d 46, 52. Under most circumstances it is appropriate to construe a statutory amendment to represent a legislative intention to change the statute's meaning. *Halley v. Board of Sch. Trustees* (1988) Ind.App., 531 N.E.2d 1182, 1184; *Metropolitan Sch. Dist. v. Mason* (1983) Ind. App., 451 N.E.2d 349, 352.[7]

As stated, the language of the former dissolution modification standard had long been interpreted to incorporate certain policies, which Mother argues should be retained in the interpretation of the revised statute. First and foremost among these policies is the presumption that the welfare of a child "is promoted by affording [the child] permanent residence rather than the insecurity and instability that follow changes in custody." *Kuiper v. Anderson* (1994) Ind.App., 634 N.E.2d 556, 558, *reh'g denied* (citing *Wible, supra,* 245 Ind. at 241, 196 N.E.2d at 574; *Adams, supra,* 230 Ind. at 275, 102 N.E.2d at 502). As the court in *Kuiper* said:

> "[I]t has been our judgment, and that of the legislature, that children will normally

---

6. In this vein, we rely upon cases from the dissolution and paternity contexts interchangeably in determining how the revised modification standard should be interpreted. This has, to some extent, been the practice of courts in the past, even considering the different standards. *E.g., In re Joe, supra,* 486 N.E.2d at 1055 n. 1. In part, this is because the standard employed in the former paternity statute—"best interests of the child"—was of primary importance to the standard utilized in dissolution cases. *Id.; see also Pierce v. Pierce* (1993) Ind.App., 620 N.E.2d 726, 729, *trans. denied.* The difference between the two standards was that, in the dissolution context, stability was presumed to be in the best interests of the child, and this presumption could be rebutted only upon the showing of the "substantial and continuing change" contemplated by the statute. As the court noted in *Pierce, supra:*

> "Our courts have long recognized that the child's interest is the paramount consideration in custody modifications and takes precedence over the parent's interests and desires. One of

these concerns is in trying to provide as stable a childhood as possible. The interest has given rise to the strong presumption that an existing custody agreement should stand. A divorce and the subsequent separation of parents is sufficiently disruptive and traumatic upon children. Courts should not add to that disruption and trauma by modifying custody except where there is a strict showing that the change in circumstances is so substantial and continuing it renders the existing custody unreasonable." 620 N.E.2d at 729 (citations omitted).

7. Under some circumstances, however, the amendment signifies the intent to express the original legislative intent more clearly. *Bailey v. Menzie* (1987) Ind.App., 505 N.E.2d 126; *Indiana Dept. of State Revenue v. Endress & Hauser, Inc.* (1980) Ind.App., 404 N.E.2d 1173, *reh'g denied.* In the context of the subject matter and caselaw history here, it is apparent that the General Assembly intended the 1994 amendments to reflect a change in statutory meaning.

prosper and mature, will learn to accept discipline and to set their own and respect others' boundaries under a standard of consistency better than they will otherwise, *even though at any given point in time the noncustodial parent may appear capable of offering 'better' surroundings, either emotional or physical."* *Id.* (emphasis supplied).

Pursuant to the assumption that stability is in a child's best interests, a number of rules have been developed constraining a trial court's discretion to modify custody. These are not rules expressly enumerated in the statute; rather, they have been developed in the caselaw of this court and of the supreme court. An extensive catalogue of these rules was offered by this court in *Winderlich, supra,* 616 N.E.2d 1057. Among the rules which the *Winderlich* court noted were: a change of custody cannot be granted (1) on the basis of a child's preference to live with the noncustodial parent; (2) on the basis of an improvement in the noncustodial parent's lifestyle or the noncustodial parent's remarriage; (3) on the basis of the custodial parent's unmarried cohabitation; (4) or because of the custodial parent's move out of state or other move making visitation inconvenient. 616 N.E.2d at 1060 (citations omitted). The animating principle behind these relatively "bright-line" rules, as well as of the generally restrictive interpretation of the former dissolution modification statute, was that because of the assumption that stability of custody is in the child's best interests, changes in custody are to be granted only upon a strict showing that the change is necessary for the child's welfare. *Id.; see also Swonder v. Swonder* (1994) Ind.App., 642 N.E.2d 1376, 1380; *Robertson v. Robertson* (1994) Ind. App., 634 N.E.2d 93, 95; *Pierce v. Pierce* (1993) Ind.App., 620 N.E.2d 726, 729, *trans. denied.*

 Upon reading the revised statutes, however, it is clear that the legislature has deleted or modified certain language which embodied the strict standard. Most notably, the statutory language requiring that the changed circumstances "make the existing custody order unreasonable" has been deleted. Further, the requirement that there be substantial *and continuing* changes in the "circumstances" has been modified, so that the court need now find only a "substantial change" in one or more of the factors which the court considers in determining the child's best interests. When a statute contains language which is deleted by the legislature, we presume that the legislature intended the deletion to represent a change in the law. *Hatcher v. Barnes* (1989) Ind.App., 597 N.E.2d 974, 975; *Indiana State Highway Comm'n v. Bates & Rogers Constr., Inc.* (1983) Ind.App., 448 N.E.2d 321, 325; *Frey v. Review Bd.* (1983) Ind.App., 446 N.E.2d 1341, 1344. We cannot simply "re-read" into a statute language which has been deleted. *See Whitacre v. State* (1980) 274 Ind. 554, 558, 412 N.E.2d 1202, 1206; *Drake v. Mitchell Community Sch.* (1994) Ind.App., 628 N.E.2d 1231, 1235, *aff'd in part and vacated in part* (1995) 649 N.E.2d 1027. We find from these rules strong support for Father's argument that the legislature "deliberately lessened the [strict] standard" for modification. Br. of Appellee at 22.

 However, a plain reading of the revised statute makes equally clear that the legislature has not simply adopted the "best interests" standard formerly applicable in the paternity context and applied at the time of the initial custody determination in both contexts. While the revised statute still requires the trial court to find that a modification in custody is in the child's best interests, it is also required to find a "substantial change" in one of the factors which are considered in determining the child's best interests. *See Van Schoyck v. Van Schoyck* (1996) Ind.App., 661 N.E.2d 1, 5, *trans. denied.*

Given the necessity that a trial court find a "substantial change" in one of the factors considered in determining the child's best interests, we conclude that the revised paternity statute does not simply permit a court to reconsider *de novo* the issue of what custody arrangement would be in the child's best interests. We find nothing in the revised statute which expressly contravenes the long-standing rule that "[a] petition to modify custody is not a vehicle to relitigate the initial custody determination as to who might

make the better parent." *Swonder, supra,* 642 N.E.2d at 1379–80. In this regard, we note that the rule applicable to initial custody determinations that "there shall be no presumption favoring either parent" has not been incorporated into the modification context. I.C. 31–1–11.5–21(a); I.C. 31–6–6.1–11(a). Further, this court has noted the importance of "dissuad[ing] former spouses from using custody proceedings as vehicles for revenge", *Kuiper, supra,* 634 N.E.2d at 558, and we simply do not believe that, in enacting these amendments, our legislature intended to provide a "persistent noncustodial parent" the opportunity to use modification proceedings as a "vehicle for relitigating the initial custody determination." *Herrmann, supra,* 613 N.E.2d at 476 (Buchanan, Sr. J., dissenting).

■■■ Our supreme court in *Poret, supra,* 434 N.E.2d at 888, specifically noted that the requirement that the existing order be "unreasonable" equated to the caselaw requirement that the change be "necessary for the welfare of the child", and that the requirement that the change be "substantial and continuing" equated to the requirement that there be a "decisive" change in conditions.[8] The deletion of the former language and the alteration of the latter, considered in the context of the cases discussed *supra,* leads us to the conclusion that the legislature has expressed disapproval of the very strict showing formerly required for modification of custody. Thus, under the proper factual scenarios, the relatively "bright-line" rules developed under the former dissolution standard concerning behavior by the custodial parent which would not support modification (e.g., move out of state), will require recon-

sideration with respect to whether the behavior results in a "substantial change" in one of the factors which a trial court may consider in determining the best interests of the child.

■■■ We find nothing in the amendments, however, which demonstrates legislative intent to do away wholesale with the policy of stability which for so long has been reflected in our caselaw in this area; rather, the better interpretation is that the retention of the statutory requirement that a court find a "substantial change" in one of the factors relevant to a child's best interests *in addition* to determining that the modification would be in the child's best interests, signals that the policy of stability continues to guide the trial courts when considering modification petitions.[9] Although child custody is now governed by statute, it has, as noted, long been an area in which the rules and experience which guide the trial courts of this state have been developed through caselaw. In this sense, child custody is an area of the law in which common-law principles are particularly well-developed, to the point that our supreme court has considered the statutory provisions to be a mere codification of the caselaw. *Poret, supra,* 434 N.E.2d at 888; *see also Lamb v. Wenning* (1992) Ind., 600 N.E.2d 96, 98 (citing *Poret*). Thus, while we of course seek to give full effect to the statutory amendments, we are hesitant to read disapproval of caselaw into the amendments absent a clear expression of such disapproval. *See Bailey v. Manors Group* (1994) Ind.App., 642 N.E.2d 249, 252, *trans. denied* ("The legislature is presumed to know the common law and to incorporate it into the statute except where it expressly indicates other-

---

**8.** As noted in *Whitman v. Whitman* (1980) Ind. App., 405 N.E.2d 608, the concepts of "substantial" and "continuing" are not coterminous. In *Whitman,* the court observed that there was sufficient evidence to support the trial court's conclusion of a "substantial" change of circumstances where the children were living in cramped and unsanitary quarters in the custodial home. However, the court nonetheless reversed the trial court's modification of custody, since the evidence showed that, in the months before the modification hearing, the custodial parent had rectified the living situation. 405 N.E.2d at 610.

**9.** We note, however, that continuity in the custodial arrangement is not the only form of "stabili-

ty" important to a child. As our supreme court noted in *Lamb v. Wenning* (1992) Ind., 600 N.E.2d 96:

"For example, where a very young child or baby is involved, a move out of state may have little or no effect on the child. For an older child who has formed friendships, attends school, and participates in activities or sports, is involved in church, or enjoys the security of supportive relationships with nearby relatives or others in his community, a move out of state may have a much more significant effect." 600 N.E.2d at 99.

wise.... We therefore presume that the legislature does not intend to make changes in the common law beyond what it declares either expressly or by unmistakable implication."); *see also Maroon v. State Dep't of Mental Health* (1980) Ind.App., 411 N.E.2d 404, 417.

■ The prevailing concern in our consideration of modification provisions has always been the child's best interests, *Pierce, supra,* 620 N.E.2d at 729, and it is clear that the amendments highlight the legislature's intent that this principle continue to be the paramount concern in a modification case. To that end, under the revised modification provision, a trial court need no longer find that an existing custody order is unreasonable in order to modify custody, so long as a "substantial change" in one of the enumerated factors has occurred, and the trial court finds as well that modification would be in the child's best interests.[10] However, when considering modification provisions under the revised standard, trial courts should not disregard principles developed under prior caselaw which have not been clearly rejected in the recent amendments. As cases are presented in which particular rules and principles come squarely into question, the interrelationship between prior caselaw and the revised statutory provisions will be more clearly defined.

Using these principles, we proceed to consider the trial court's application of the revised statute in this case.

## II.

■ Pursuant to Father's emergency petition, he was granted temporary custody of N.D.L. on August 23, 1994, pending resolution of a permanent custody hearing. At that hearing, held December 6 and 13, 1994,

significant evidence was presented, without objection from Mother, concerning improvement in N.D.L.'s condition while in Father's custody. Mother now argues that the trial court erred in considering such evidence, and argues that the decision transferring custody to Father was erroneously premised upon such evidence. Father counters that Mother waived objection to such evidence by failing to object to it at trial. We agree that Mother waived any appellate argument on this issue;[11] however, in the interest of providing guidance to trial courts on how such evidence may (and may not) be properly considered, we address the issue nonetheless.

Mother's argument on this issue is premised upon *Pea v. Pea* (1986) Ind.App., 498 N.E.2d 110, *trans. denied,* in which this court held that, pursuant to I.C. 31–1–11.5–7(f), an order of temporary custody in a dissolution proceeding is to be without prejudice to the rights of the respective parties. 498 N.E.2d at 114–15.

We find analogy between Mother's argument and the decisions of this court concerning what evidence a trial court may consider in determining whether custody may be modified. We have often noted in cases under the former dissolution standard that, while changes in the noncustodial parent's situation are not irrelevant to whether modification is warranted, it is a "change of conditions in the custodial home or a change in the treatment of the children in the custodial home which necessitates removal." *Swonder, supra,* 642 N.E.2d at 1380; *see also Herrmann, supra,* 613 N.E.2d at 474. Changes in the noncustodial home, absent changes in the custodial home as well, have never supported a change in permanent physical custody. *Pierce, supra,* 620 N.E.2d at 729; *Drake v. Washburn* (1991) Ind.App., 567 N.E.2d 1188, 1190, *trans. denied.*

---

10. We note that, even under the prior dissolution custody modification standard, a trial court was not required to find that a custodial parent was unfit in order to justify modification. *Lamb, supra,* 600 N.E.2d at 99.

11. It is axiomatic that a litigant may not "sit idly by without objecting, await the outcome of trial and, thereafter, raise an issue for the first time on appeal." *Elbert v. Elbert* (1991) Ind.App., 579 N.E.2d 102, 107 n. 2; *see also McCallister v.*

*McCallister* (1986) Ind.App., 488 N.E.2d 1147, 1152 n. 3. Here, as Father points out, Mother not only failed to object at trial to the admission of evidence concerning N.D.L.'s improvement while in Father's custody, but actually cross-examined Father's expert witnesses at length concerning such evidence. In any event, as will be discussed *infra,* notwithstanding waiver, we ultimately conclude that the trial court did not err in considering such evidence.

We think these principles apply to prohibit courts from basing a change in permanent physical custody upon evidence of changes in a child's condition occurring during the period in which the physical custody of that child has been transferred to the noncustodial parent pursuant to an emergency petition. Such an emergency petition may be granted *ex parte* where it is necessary "to protect the children from irreparable harm in an emergency." *Owen v. Owen* (1990) Ind.App., 549 N.E.2d 410, 412–13, *adopted in part and vacated in part*, 563 N.E.2d 605, *reh'g denied.* However, the granting of the petition is to be followed by an immediately scheduled hearing. *Id.*

In *Owen* Father filed an emergency petition based upon the admission of Mother, who lived out-of-state, into a hospital for treatment of a psychiatric disorder. The trial court granted the petition *ex parte*, and set a date for a hearing when Mother could appear. The hearing was continued for eight months due to procedural wrangling between the parties, during which time Father retained custody of the children. Ultimately, the trial court ordered custody to be transferred to Father, based upon Mother's mental health problems.

This court reversed the trial court's order transferring custody, finding that there had been insufficient evidence of changed circumstances to warrant transfer of custody, but our supreme court ultimately vacated that portion of this court's opinion and affirmed the trial court. These actions are not so noteworthy for the ultimate disposition of the case, but for the rationale utilized by both appellate benches. Both premised their decisions upon whether there were changes in Mother's condition supporting the trial court's judgment; neither case report suggests that evidence concerning any "improvement" in the children's condition while in Father's temporary care properly formed the basis of a decision to transfer permanent custody, despite the eight month period of

temporary custody. 563 N.E.2d at 607–09, 549 N.E.2d at 414–16.

As this court noted in *Owen*, it is preferable that parents be encouraged to use proper legal channels to address "emergency" situations, even though such channels may result in *ex parte* orders, since "[t]o hold otherwise would discourage noncustodial parents from seeking temporary custody in court and encourage them to take matters into their own hands. [Father's] seeking temporary custody through court order is the preferred and legal way." 549 N.E.2d at 413. On the other hand, to permit a noncustodial parent to utilize an *ex parte* order to gain temporary custody of a child, then permit permanent custody to be transferred to that parent based upon evidence of "improvement" in the child's condition while in that parent's temporary care, might tend to encourage noncustodial parents to bring such petitions not on their merits, but as a conduit to obtain temporary custody of a child, then present evidence of such "improvement" as a "backdoor" way of relitigating the initial custody determination.[12] As stated, the proper inquiry in a modification hearing under the revised standard is not who would make the "better" parent; rather, the focus is upon whether a substantial change in one of the factors relevant to the determination of a child's best interests has occurred. Thus, we hold that the "substantial change" necessary to support a modification of custody may not be premised upon evidence of improvement in a child's condition while that child has been in the temporary custody of a noncustodial parent.

This is not to say, of course, that such evidence is wholly irrelevant in a modification proceeding. To the contrary, in deciding whether to modify custody, the paramount concern is the best interests of the child. *Doubiago v. McClarney* (1995) Ind.App., 659 N.E.2d 1086, 1088, *trans. denied; Winderlich, supra,* 616 N.E.2d at 1059. In addition to finding that a "substantial change" has occurred in at least one of the factors rele-

---

12. As evidenced by the almost three-month delay between the original hearing date scheduled in this case and the ultimate dates on which the hearing occurred, a noncustodial parent might in fact obtain custody for a relatively significant amount of time pursuant to an *ex parte* order prior to the ultimate custody determination. We note that there is absolutely no evidence of improper motive on Father's behalf in this case.

vant to the child's best interests, the trial court must also conclude that modification would in fact be in the child's best interests. *Van Schoyck, supra,* 661 N.E.2d at 5. In determining whether modification would be in the child's best interests, a trial court must consider "all relevant factors, including changes in circumstances of both the custodial and noncustodial parents and the resulting and potential advantages and disadvantages to the child." *Lamb, supra,* 600 N.E.2d at 99. Further, one of the expressly enumerated factors a court is required to consider when determining the child's best interests is "[t]he interaction and interrelationship of the child with his parent or parents". I.C. 31–1–11.5–21(a); *see* I.C. 31–6–6.1–11(a). It goes virtually without saying that evidence concerning the type of home environment provided by the noncustodial parent during the temporary period of custody is relevant to a determination upon a petition for permanent transfer of custody whether the transfer would be in the child's best interests, as is all other pertinent evidence a trial court would consider in an initial determination of a child's best interests. We reiterate, however, that such evidence is not relevant to the issue of whether a "substantial change" in the factors relevant to the child's best interests has occurred, and absent such a change, modification of custody cannot be warranted.

Notwithstanding Mother's waiver, because evidence concerning N.D.L.'s condition and improvement while in Father's temporary care was relevant to the determination whether the modification of custody would be in N.D.L.'s best interests, the trial court did not err in considering such evidence.

### III.

▮▮▮▮ Mother argues that the evidence adduced during the hearing failed to support the conclusion that a "substantial change in circumstances" occurred. Father counters that the trial court was well within its discre-

tion to order the modification, based upon the deleterious changes that occurred in N.D.L.'s condition while in Mother's care which led to the emergency petition, and ultimately to Father's request for a permanent change in custody. Upon review of the record and consideration of our standard of review in such cases, we are constrained to affirm the trial court's assessment of the evidence and the conclusion reached. Mother appeals a modification of custody in which the trial court entered findings of fact and conclusions of law. Our standard of review in such cases is limited to determining whether the evidence in the record supports the special findings, and whether those findings are adequate to support the judgment. *Van Schoyck, supra,* 661 N.E.2d at 5. Modification of custody is an area committed to the sound discretion of the trial court, and we are constrained to neither reweigh evidence nor judge the credibility of witnesses. *Id.* We must consider only that evidence which supports the trial court's judgment, and reversal is warranted only upon a showing of abuse of discretion, or where "the decision is clearly against the logic and effect of the circumstances before the court." *Kuiper, supra,* 634 N.E.2d at 558; *see also Poret, supra,* 434 N.E.2d at 887 (citing *Campbell v. Campbell* (1979) Ind.App., 396 N.E.2d 142, 143).

▮▮▮ We note at the outset that Mother has not challenged the trial court's conclusion that it would be in N.D.L.'s best interests for Father to have custody.[13] Further, we have already concluded *supra* that evidence of changes in N.D.L.'s condition occurring while she was in Father's temporary custody cannot form the basis of a "substantial change" justifying a modification in permanent custody. Thus, our inquiry in this case focuses upon whether there was adequate evidence of changes occurring to N.D.L. while in Mother's custody prior to the emergency petition which justified the transfer of custody.[14]

---

13. We note, however, that there was more than ample evidence to sustain the trial court's conclusion in this regard, including the testimony of Dr. Ehrmann that it would be in N.D.L.'s best interests to be in Father's custody, Ms. Goldfarb's testimony concerning improvements in N.D.L.'s emotional state, and Dr.Dias' testimony concerning improvements in N.D.L.'s physical health.

14. Because Father did not base his petition for custody upon changes in his home or status, we are not directly called upon to decide the continuing validity of our longstanding rule that a

The trial court found that substantial changes had occurred in four of the factors enumerated by statute. Specifically, the trial court found that substantial changes had occurred in: 1) N.D.L.'s physical health; 2) N.D.L.'s mental health; 3) N.D.L.'s wishes with respect to custody; and 4) Father's wishes with respect to custody. We consider each separately.

With respect to N.D.L.'s physical health, the evidence at trial favorable to the trial court's findings showed that, in the year preceding Father's petition, N.D.L., who was already an obese child at age eleven, gained forty pounds. This weight gain, approximately half of which occurred in the roughly three-month period preceding the petition, appeared to contribute to N.D.L.'s developing high blood pressure, exacerbated her preexisting neuromuscular problems, and contributed to her difficulty with mobility. Father, who is a physician with training in nutrition, testified that N.D.L.'s health would be placed at risk if she continued to gain weight in that manner. While Mother was aware N.D.L.'s obesity was a problem and believed a mildly calorie-restricted diet was the best approach to addressing the issue, she generally allowed N.D.L. to select and prepare her own meals and was unaware of N.D.L.'s recent weight gain. Further, although Dr. Ehrmann acknowledged that Mother had not been "grossly negligent" with respect to her nutritional supervision of N.D.L., he felt that a lack of supervision contributed to N.D.L.'s obesity. N.D.L. very much wanted to lose weight, but felt that she was not receiving adequate assistance in doing so from Mother.

When considering evidence of changes, courts must look to the effect of the changes on the particular child. Because of this, we

must be particularly hesitant to reverse a trial court's finding that a particular change is or is not "substantial." *Lamb, supra,* 600 N.E.2d at 99; *Poret, supra,* 434 N.E.2d at 888. Mother argues that, because N.D.L. had been an obese child for a long period of time, there was inadequate evidence that her weight gain was a "substantial change" in her physical health. Upon the record presented, and with due regard for the trial court's latitude in this area, however, we cannot say that the evidence of N.D.L.'s forty-pound weight gain, especially considered in light of the effect of this gain on N.D.L.'s preexisting physical difficulties, did not support a finding that N.D.L. had experienced a substantial change in her physical health.

With respect to the finding concerning N.D.L.'s mental health, the evidence at trial favorable to the trial court's findings demonstrated that, prior to Father's petition, N.D.L. had become quite depressed and articulated thoughts of suicide or self-harm. She expressed these thoughts, as well as her feelings of abandonment and isolation while in Mother's custody, to both Dr. Dias and Ms. Goldfarb. Initially, Father was advised to allow N.D.L. to return to Mother, so that Mother and N.D.L. could take a previously scheduled vacation, which Dr. Dias felt might serve as a natural stress reliever. However, upon returning to Father following the vacation, N.D.L. reiterated her feelings of loneliness and depression while in Mother's custody. While it became clear that N.D.L. in fact embellished the amount of time she was actually left alone by Mother, there was expert testimony that this embellishment was a manifestation of a real sense of loneliness and isolation N.D.L. felt while in Mother's custody.

modification of custody cannot be premised solely upon changes in the noncustodial home. *Pierce, supra,* 620 N.E.2d at 729; *Drake, supra,* 567 N.E.2d at 1190; *Pea, supra,* 498 N.E.2d at 115. We note, however, that if the notion that stability plays a role in the best interests of the child is to have any continued vitality (as we have already determined *supra* is consistent with the revised statutory provision), the policies behind the rule should be unaffected by the statutory revisions. In other words, removal of a child from a home in which the custodial parent has already been found (at the initial

hearing) to be the preferred parent to have custody, and in which there has been no deterioration in the factors relevant to determining the child's best interests, should be warranted, if at all, only in the most extreme circumstances. When a noncustodial parent's situation has improved dramatically, financially or otherwise, there are ample ways for a caring parent to share this improvement with the child unrelated to subjecting the child to the trauma of a custody fight. *See In re the Marriage of Richardson* (1993) Ind., 622 N.E.2d 178, 181 (DeBruler, J., concurring in result).

Mother argues forcefully that, since there was testimony at trial that N.D.L. likely never intended to act on her suicidal tendencies, and possibly never had such feelings in the first place, this cannot be used to establish a substantial change in circumstances. This in effect asks us to reweigh the import of various testimony. While Dr. Ehrmann did express doubts about the sincerity of N.D.L.'s thoughts of self-harm, neither he nor any of the other experts directly stated that N.D.L. did not in fact have such thoughts. All experts agreed that her emotional state while in Mother's custody was very unhappy and depressed. It may well be that such feelings are natural for a young person entering her pre-adolescent years. Indeed, there was testimony that it was not unusual for young people to have such feelings, and not to communicate those feelings to their parents. However, Dr. Ehrmann also testified that "a parent that is really focused on and concerned about a child would pick up on some of the apparent degrees of sadness and or depression that was there and pursue that." Record at 248. Mother testified that she was not aware of the depth of N.D.L.'s depression.

We do not seek to imply that Mother was severely derelict in her care of N.D.L.. Indeed, the evidence did show that Mother truly loves N.D.L. and does attempt to address those of N.D.L.'s problems of which she is aware. Viewed one way, the evidence of change in N.D.L.'s emotional state could be seen as a response to typical pre-adolescent anxieties, exacerbated perhaps by the particular physical and social challenges faced by N.D.L.. However, it is the province of the trial court to determine how the evidence is to be viewed, and where the evidence at least arguably supports the trial court's findings, we are constrained to uphold them. *In re the Marriage of Richardson* (1993) Ind., 622 N.E.2d 178, 179. It appears that N.D.L. may be a child with unusual needs, and we note our supreme court's admonition that, "[i]t is, after all, the effect upon the child that renders the change sub-

stantial or inconsequential; and a change that might be regarded as slight or inconsequential in one case might be catastrophic in another." *Poret, supra,* 434 N.E.2d at 888. We find no basis for reversing the trial court upon this issue.

With respect to the finding concerning N.D.L.'s wishes, Mother relies on our longstanding rule that a change in the child's wishes, standing alone, cannot support a change in custody. *In re Richardson, supra,* 622 N.E.2d at 179; *Drake, supra,* 567 N.E.2d at 1191; *Pribush v. Roy* (1983) Ind.App., 456 N.E.2d 747, 750. This rule is inapplicable to the present case. As noted, the trial court's findings with respect to other substantial changes are supported by the evidence. Thus, N.D.L.'s wishes do not form the sole basis for modification of custody.[15] What is clear, however, is that N.D.L. firmly wishes to reside with Father, and she expressed those wishes to all experts and to Mother. We have no record of N.D.L.'s wishes in the past, other than the fact that she has resided with Mother since she was an infant. Her strongly-expressed desire now to live with Father could have been appropriately viewed as reflecting a "substantial change" from the former absence of any preference. *Cf. In re Richardson, supra,* 622 N.E.2d at 180 (wishes of eleven-year old boys to live with noncustodial parent "may be considered" in determining whether substantial change occurred). The trial court did not err with respect to this issue.

Finally, with respect to Father's wishes, we reject Mother's argument that Father's desire for twice-monthly visitation rejected by this court in *In re Joe, supra,* "demonstrated a very strong desire to be the custodial parent, despite having previously conceded custody to Mother." Br. of Appellant at 31. To the contrary, Father did not earlier express a desire to be the custodial parent, and the custodial arrangement arrived at following this court's decision in *In re Joe,* by which Mother was the custodial parent, was honored by Father without conflict until the

---

15. We note that the legislature has amended the statutory provision addressing the child's wishes, so that more weight is to be given to the child's wishes if the child has attained the age of four-teen. I.C. 31–1–11.5–21(a)(3); I.C. 31–6–6.1–11(a)(3). We express no opinion about the effect of this amendment.

time of this petition. We conclude that Father's desire at the present time to have custody of N.D.L. constitutes a "substantial change" in his wishes concerning custody. We note again, however, that because this is not the only "substantial change" properly found by the trial court, we need not address, and our opinion should not be read to support, the proposition that such a change in Father's wishes would be adequate by itself to support modification. *See* n. 14, *supra.*

Because we conclude that there was adequate evidence to support the trial court's findings with respect to substantial changes occurring to N.D.L. while in Mother's custody, we hold that the evidence supports the trial court's decision modifying custody.

### IV.

 Mother argues finally that the trial court erroneously placed the burden of proof upon her to establish a change of circumstances within her home as a prerequisite to N.D.L.'s return. We disagree.

Mother's argument on this point is based entirely upon the court's Conclusion of Law # 9, which stated:

"There were no material facts produced to prove that circumstances have changed in Mother's home that would make it in the best interests of [N.D.L.] to return to Mother." Record at 108.

Mother would have us read this statement to mean that "the trial court has obviously utilized the award of temporary custody to misplace the burden of proof to require Mother to establish that it is in [N.D.L.'s] best interest to return to the prior custody arrangement." Br. of Appellant at 25. However, when we consider the trial court's special findings, they are to be looked at as a whole, and are construed liberally to support the judgment. *Cox v. Cox* (1991) Ind.App., 580 N.E.2d 344, 348, *trans. denied; Cornett v. Cornett* (1982) Ind.App., 412 N.E.2d 1232, 1235. We will reverse a judgment only where we are left with the "firm conviction" that a mistake has been made. *Cox, supra; Cornett, supra; see also National Fleet Supply, Inc. v. Fairchild* (1983) Ind.App., 450 N.E.2d 1015, 1017.

Read as a whole, it is apparent that the trial court in fact correctly placed the burden of proof upon Father to demonstrate that a substantial change in one or more of the circumstances relevant to the determination of N.D.L.'s best interests had occurred while in Mother's custody. For example, conclusion of law # 4 states that: "Substantial changes are evident in several of the factors set out in I.C. 31-6-6.1-11(a). The most prominent substantial changes occurred in [N.D.L.'s] mental and physical health." Record at 107. Immediately following this, conclusion of law # 5 states: "[N.D.L.] suffered a substantial change in her mental health over the last one and one half years (1½) while in the custody of Mother." *Id.* Additional findings by the court included a finding that, while in Mother's custody, N.D.L. gained nearly forty pounds in one year (finding of fact # 5a); a finding that, while in Mother's custody, N.D.L. talked of wanting to hurt herself (finding of fact # 5d); and a conclusion that N.D.L. "suffered from depression and loneliness and had thoughts of hurting herself on nearly a daily basis while with Mother." Record at 107 (conclusion of law # 5). We read conclusion of law # 9 simply to reiterate the trial court's conclusion concerning the other finding that it was required to make to justify modification of custody—that permanent custody with Father would be in N.D.L.'s best interests. While perhaps conclusion of law # 9 is not a model of draftsmanship, we are not convinced that it demonstrates any improper burden-shifting in this case. We find no reversible error upon this issue.

### CONCLUSION

The recent revisions to the paternity and dissolution custody modification statutes represent legislative disapproval of the very strict showing required to justify modification under the former dissolution standard, as well as an intent to equalize the standard in both the dissolution and paternity contexts. The focus in considering a modification petition is not upon whether the existing order is unreasonable, but upon whether a substantial change has occurred in the factors relevant to the child's best interests, and, provided such a change has occurred,

whether modification would be in the child's best interests. The amendments do not do away wholesale with the longstanding policy of stability that has animated caselaw in this area, however, and this policy is not to be disregarded, but rather, reconsidered in each case with respect to whether a substantial change in the factors relevant to the best interests of the child has occurred. Pursuant to this, changes in a child's condition occurring while in the temporary custody of the noncustodial parent are not relevant to whether such a substantial change has occurred, though they are relevant to whether the modification would be in the child's best interests.

The judgment is affirmed.

KIRSCH and ROBERTSON, JJ., concur.