## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 03 2018, 5:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Zachariah M. Phillips
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Karen R. Swopes
Terre Haute, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Amy Fulk,

*Appellant-Defendant,*

v.

Jonathan Fulk,

*Appellee-Plaintiff.*

April 3, 2018

Court of Appeals Case No.
77A01-1706-DR-1358

Appeal from the Sullivan Superior Court

The Honorable Hugh R. Hunt, Judge

Trial Court Cause No.
77D01-1112-DR-408

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, Amy Fulk (Mother), appeals the trial court's Order, modifying the custody and parenting time of the minor children in favor of Appellee-Petitioner, Jonathan Fulk (Father).

We affirm.

# ISSUES

Mother presents us with four issues on appeal, which we restate as:

(1) Whether the trial court showed bias during the proceedings and denied Mother due process;

(2) Whether the trial court properly proceeded on Mother's emergency petition to modify custody of J.F.;

(3) Whether the trial court erred in modifying parenting time with J.F; and

(4) Whether the trial court failed to include in its Order that the parenting time coordinator had discretion to modify Mother's parenting time pursuant to the Indiana Parenting Time Guidelines.

# FACTS AND PROCEDURAL HISTORY

On February 27, 2012, the marriage between Mother and Father was dissolved by agreed settlement. In their settlement, the parties consented to share joint legal and physical custody of their two minor children, A.F., born on January 10, 2003, and J.F., born on October 29, 2005. On July 14, 2014, the parties modified custody by agreement, assenting that Mother would have primary

physical custody of A.F. and Father would have primary physical custody of J.F.; each party was to receive parenting time pursuant to the Indiana Parenting Time Guidelines. After the parties modified custody, Father no longer received significant parenting time with A.F.

[5] At some point in October of 2015, Father contacted A.F.'s school, West Vigo Middle School, to inquire how she was doing. When West Vigo Middle School informed Father that A.F. had missed a lot of school days, he called the Department of Child Services (DCS) and requested them to investigate. A.F.'s school records revealed that she was absent from school for 137.5 full and half days for the combined 2014/15 and 2015/16 school years. For the 2015/16 school year alone, it was determined that A.F. was absent for 112 full days and an additional 17 partial days. A.F.'s school records included a certificate of student's illness and capacity form, dated November 12, 2015 and signed by Robert Fallon, MD. When the school nurse requested Mother to sign a release for A.F.'s medical records, Mother refused.

[6] In October of 2015, Mother also informed Father that A.F. was being treated at Riley Hospital for Children (Riley Hospital) after being diagnosed with cancer and that she was terminally ill. When Father was scheduled to accompany A.F. to a doctor's appointment, it was cancelled at the last minute. Although Father carried health insurance on A.F., no medical claims were submitted, and, not receiving any further information from Mother, Father, upon contacting Riley Hospital directly, discovered that no records of any treatment existed. A.F.'s Guardian Ad Litem (GAL) contacted the manager of Riley

Hematology Oncology Outpatient Clinic who, upon examination of the signature on the certificate of student's illness, disavowed any familiarity with the signature as being of one of the physicians at Riley. After a diligent search of the records, the manager also informed the GAL that there were no records establishing A.F. had been treated at Riley Hospital.

[7] Father discovered that A.F. had been treated and released from the emergency department of Union Hospital at Terre Haute on September 30, 2015. Although Mother testified that A.F. had been treated for an enlarged spleen during that visit, the medical records do not indicate such a finding. In fact, the results of all the tests appear to be normal. A mere fifteen days after A.F. had been treated and released from Union Hospital, Father was alerted of a benefit to raise funds for A.F.'s treatment for leukemia. Father did not attend as he did not believe that A.F. was terminally ill.

[8] On July 8, 2016, Father filed a motion for rule to show cause, a motion for expedited hearing, and a motion for attorney fees[1] (First Motion). On September 13, 2016, the parties appeared before the trial court regarding the First Motion and agreed that Father's parenting time would start again by October 13, 2016, and that the parties would participate in counseling to rehabilitate the relationship between Father and A.F. On November 28, 2016,

---

[1] It should be pointed out that Appellant's Appendix is woefully incomplete. Besides the chronological case summary and the trial court's order, Appellant failed to submit any of the other filings or pleadings that are helpful to this court in its review.

Father filed a second motion for modification of custody of A.F., a motion for modification of parenting time, a motion for rule to show cause, and a motion for attorney fees (Second Motion).

[9] On January 31, 2017, the GAL filed a report with the trial court and a request for order mandating the disclosure of A.F.'s medical records, which was granted by the trial court that same day. On March 3, 2017, the GAL filed a request for hearing with the trial court. Thereafter, on April 7, 2017, Father again filed a motion for rule to show cause, for attorney fees, and a motion for the appointment of a parenting time coordinator (Third Motion). On April 12, 2017, the trial court held a hearing on Father's Third Motion and found Mother in direct contempt of court for failing to provide the requested medical records, as ordered previously. The trial court allowed Mother one week to purge her contempt. On April 19, 2017, Mother failed to provide any evidence of medical records, leading the trial court to exclaim "the fact that there's -you cannot provide one (1) shred of medical evidence that this child has been diagnosed with anything, it's just, it's preposterous, it's unacceptable." (Suppl. Tr. p. 75). Accordingly, the trial court entered an order, mandating Mother to serve twenty days at the Sullivan city-county correctional facility due to her contempt of the trial court's order to provide "documentation regarding [A.F.'s] diagnosis of and treatment for CLL." (Appellee's App., Vol. II, p. 35). During the time Mother served her jail sentence, Father was granted temporary physical custody of A.F. To date, Mother has yet to provide records of any medical providers or

affiliated university, indicating that A.F. was diagnosed and treated for CLL Blood Disorder/Leukemia or any other terminal illness.

[10] During the twenty days A.F. was in Father's custody while Mother was serving her sentence for contempt, A.F. spent time with family members she had not seen in years and appeared to enjoy herself. After Mother was released and A.F. returned to her custody, Father has not received any parenting time with A.F. On May 19, 2017, the GAL filed her report with the trial court, recommending a change in custody of A.F. from Mother to Father. On May 30, 2017, the day before the parties' modification hearing, Mother filed a petition for emergency custody of J.F.

[11] On May 31, 2017, the trial court conducted a hearing on the parties' motions for modification of the children's custody. During the hearing, the trial court treated the hearing as "a continuation of the hearings that have gone before" and, as such, took judicial notice of previous testimony and incorporated the exhibits already admitted during the hearing of April 12, 2017. (Tr. Vol II, p. 5).

[12] In response to Mother's allegations raised in her petition for emergency custody of J.F., Father testified that he had dropped his son off for parenting time with his Mother on Friday, May 26, 2017. At the time, J.F. appeared fine. The following day, Saturday, May 27, 2017, J.F. was admitted to the emergency room at Regional Hospital. The medical records indicated that J.F. was diagnosed with a broken arm. Although the x-ray appeared normal, the MRI

showed a "slight volar angulation of the distal humerus, and an elbow joint effusion is present." (Exh. 7). DCS was informed because J.F. explained that his Father had hurt his right arm by pulling him off his ATV the Tuesday before. Recalling the incident, Father explained that J.F. was out on his Razor, picking up sticks on the field, while Father was on a tractor. At a certain point, J.F. complained that his right arm had "lost power." (Tr. Vol. II, p. 130). Later that evening, J.F. called Mother and told her about the incident. Father asked J.F. if he needed to go to the emergency room, but J.F. assured him that he was "fine." (Tr. Vol. II, p. 131). The following morning. J.F. went fishing and tossed the football around with his stepbrother.

[13] On July 10, 2017, the trial court issued its very detailed findings of fact, conclusions of law, and judgment, decreeing, in pertinent part:

> Educational Neglect. Due to the complete lack of any medical record that supports Mother's assertion that [A.F.] was diagnosed and treated for CLL Blood Disorder/Leukemia, the [c]ourt finds that [A.F.] was not diagnosed and treated for CLL Blood Disorder/Leukemia. As such, the level of educational neglect, 112 full days and 17 partial days in the 201/2016 school year, is a substantial change of circumstances that supports a change of custody pursuant to [I.C. §] 31-17-2-21.

> Mental and Physical Health: It is clear to the [c]ourt that Mother's story of [A.F.'s] CCL Blood Disorder/Leukemia is a fabrication. The [c]ourt also concludes from the nature of the fabrication and extent to which Mother has held firm to it that she may be suffering from some type of mental illness, whether Munchausen by proxy, antisocial personality disorder or some other type of mental illness, and as a result that parenting time

with Mother might endanger the child's physical health or significantly impair the child's emotional development, and that it is in the best interest of [A.F.] for parenting time with Mother to be supervised.

Further, the nature of the fabrication is particularly troubling to this [c]ourt. The lack of empathy and respect for those who suffer true pain and hardship due to terminal illness is appalling. It is beyond the pale that a person or persons would benefit from a fundraiser for an illness that is fabricated. It is beyond the pale that a doctor's signature would be forged to perpetuate this lie.

It is clear to the [c]ourt that custody of [J.F.] should not only remain with Father because Mother has not met her burden of proof regarding modification of custody (emergency or otherwise), but that Mother's parenting time with [J.F.] should be supervised as well. The [c]ourt finds that, for [J.F.] as well, parenting time with Mother might endanger his physical health or significantly impair his emotional development, and that it is in the best interest of [J.F.] for parenting time with Mother to be supervised. [J.F.'s] injuries and story do not align with the observations of multiple persons who observed and interacted with him in the days preceding Mother's parenting time with him commencing on May 26, 2017. They also do not align with the observations of multiple persons who have observed and interacted with Father and son over the years.

Parental Alienation: It is clear to the [c]ourt that Mother has no intention of allowing Father to have parenting time with his daughter. The [c]ourt is convinced that if custody of [A.F.] were to remain with Mother, that Father would never have the opportunity to have a relationship with his daughter. It is clear that Mother's actions in routinely denying parenting time to Father, to which Father was entitled, is a substantial change in the interrelationship of the parties, which permits a modification in custody pursuant to Indiana caselaw. It is also clear that

profound parental alienation has already occurred due to the fabrication of [A.F.'s] illness. [A.F.] clearly blames Father for the consequences of her Mother's lies.

(Appellant's App. Vol. II, pp. 24-25).

[14] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[15] The trial court entered specific findings of fact and conclusions thereon in its Order modifying custody and parenting time in favor of Father. Pursuant to Indiana Trial Rule 52(A), this court will "not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Jarrell v. Jarrell*, 5 N.E.3d 1186, 1190 (Ind. Ct. App. 2014) (citing *D.C. v. J.A.C.*, 977 N.E.2d 951, 953 (Ind. 2012)), *trans. denied*. Considering only the evidence most favorable to the trial court's judgment and all reasonable inferences derived therefrom, we will find clear error only if the evidence, either directly or by inference, fails to support the findings, or if the findings fail to support the conclusions. *Id.*

[16] In addition, there is a well-established preference in Indiana "for granting latitude and deference to our trial judges in family law matters." *Swadner v. Swadner*, 897 N.E.2d 966, 971 (Ind. Ct. App. 2008). "[A]ppellate courts 'are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized

their testimony as it came from the witness stand, did not properly understand the significance of the evidence.'" *D.C.*, 977 N.E.2d at 956-57 (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)). Our State's courts have long emphasized a concern that there be finality in matters concerning child custody. *Baxendale v. Raich*, 878 N.E.2d 1252, 1258 (Ind. 2008). "Modification of custody is an area committed to the sound discretion of the trial court, and we are constrained to neither reweigh evidence nor judge the credibility of witnesses." *Joe v. Lebow*, 670 N.E.2d 9, 23 (Ind. Ct. App. 1996).

### I. *Judicial Bias and Prejudice*

[17]     Mother first contends that trial court's numerous instructions preventing her from presenting any testimony with respect to A.F.'s illness amounted to bias and violated her due process rights. The law presumes that a judge is unbiased and unprejudiced in the matters that come before the judge. *Flowers v. State*, 738 N.E.2d 1051, 1060 (Ind. 2000), *reh'g denied*. A judge has the discretionary power to disqualify himself or herself *sua sponte* whenever any semblance of judicial bias or impropriety comes to the judge's attention. *Id*. In addition, where a judge harbors actual prejudice in a case, justice requires that a *sua sponte* judicial disqualification from the case be made. *Id*. The test for determining whether a judge should recuse himself or herself is "whether an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality." *James v. State*, 716 N.E.2d 935, 940 (Ind. 1999). Furthermore, the party alleging judicial bias "must show that the trial judge's action and demeanor crossed the barrier of

impartiality and prejudiced the [party's] case." *Flowers*, 738 N.E.2d at 1061. An adverse ruling alone is insufficient to show bias or prejudice. *Id.* at 1060 n.4.

[18]  Mother proceeded *pro se* during the continuation of trial on May 31, 2017. It is well settled that *pro se* litigants are held to the same standards as licensed attorneys, and thus are required to follow procedural rules. *Evans v. State*, 809 N.E.2d 338, 344 (Ind. Ct. App. 2004), *trans. denied*. However, when Mother questioned the GAL and Father's witnesses, she was prone to interject her own testimony. As such, the trial court had to instruct her on numerous occasions to ask questions only. During Mother's cross-examination of the GAL, the trial court navigated the issue as follows:

> [TRIAL COURT]: Again, you're not asking questions. So, [], maybe I can take over here.
> [MOTHER]: Sorry.
> [TRIAL COURT]: The assertion's been made by [Mother], and maybe we can put that to rest, that you [*i.e.*, GAL] may be just focused in on a short period of time. Is there any way we can kind of clarify that? I mean, we understand that—and you must understand [Mother], it's not like she has the time[] to go over every second [] every facet of the relationship from beginning to end. I mean, it's [] only possible that she is going to get a quick snapshot sometimes[.]

(Tr. pp. 28-29). When Mother commenced presenting her case-in-chief, the trial court advised her that she had "the right to present [her] case as she wanted." (Tr. p. 179).

[19]    Nevertheless, claiming that the trial court displayed actual bias, Mother argues that the trial court did not allow her to present *any* testimony to contradict Father's allegations that she had fabricated A.F.'s illness. By order of January 31, 2017, the trial court had mandated Mother to present A.F.'s medical records. Mother refused and was held in contempt, serving twenty days in jail. Despite the fact that Mother never provided A.F.'s medical records and the trial court reminded her of the contempt, the hearing transcript is littered with Mother's testimony referencing A.F.'s illness. The trial court even noted in its findings of fact:

> 32. Mother testified, under oath, that [A.F.] was diagnosed and treated for CLL Blood Disorder and that is why she was absent from school, and also that she was treated for it in a 'university study.' Mother described for the [c]ourt the 'shots' that [A.F.] was given as treatment. Mother also indicated to the GAL that [A.F.] has received an evaluation/consultation at Riley Hospital for Children.

(Appellant's App. Vol. II, p. 15). Furthermore, evidence presented during the April 12, 2017 hearing, which the trial court took judicial notice of during the May 31, 2017 hearing, revealed the GAL reporting:

> I discussed [A.F.'s] health issue with [Mother] and she explained in September of 2015 she became concerned because the doctors could not figure out what was wrong with [A.F.]. She indicated she took [A.F.] for a 'consult with Riley Children's Hospital' and 'they wanted to remove [A.F.'s] spleen and do chemo. I chose a less invasive process through St Louis Children's Hospital.' [Mother] reported [A.F.] was diagnosed with 'CLL blood disorder' and explained it was a 'type of leukemia.' I inquired as

to whether she had brought any documentation regarding the illness and she indicated she did not and that she was not going to provide any information to me or to [Father]. She stated 'I am not giving [Father] the information. John has it.' I provided her documentation where Riley Hospital and St Louis Children's Hospital had reported they had no records regarding [A.F.]. She stated that was correct because Riley was merely a consult and the 'trial' [A.F.] received was administered by a 'University' rather than the Hospital. [Mother] presented pictures that she represented were done during [A.F.'s] treatment. However, [A.F.'s] face did not physically appear in the pictures, which she said was due to [A.F.] not liking to have her picture taken. [Mother] reported her lack of willingness to provide any further information is because [Father] would merely find fault in the type of treatment she chose to seek on behalf of [A.F.], but acknowledged the treatment was successful and [A.F.] is doing well. She stated 'I am putting my foot down . . . something else will come from it.' [Mother] repeatedly expressed her feelings of frustration regarding [Father] and stated 'it's got to stop. Why am I trying to prove myself worthy? He should be proving he is worthy.'

(Appellant's App. Vol. II, p 18).

[20] At no point was Mother prevented from presenting her case or from questioning witnesses. At most, the trial court admonished her and reminded her "not to expound [] forever" on A.F.'s illness. (Tr. p. 23). Despite this reprimand, numerous witnesses testified about A.F.'s perceived illness and its impact on their lives and Mother was allowed to cross-examine them. The trial court clearly considered this evidence when it issued its Order. Accordingly, we cannot conclude that an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's

impartiality" or that the trial court's "demeanor" prejudiced Mother. *See James*, 716 N.E.2d at 940: *Flowers*, 738 N.E.2d at 1061.

## II. *Mother's Emergency Petition for Custody*

[21] Despite Mother filing an emergency petition for modification of J.F.'s custody the day before the hearing, she now contends that the trial court erred on proceeding on her petition. Indiana Trial Rule 6(D) provides that "[a] written motion, other than one which may be heard *ex parte*, and notice of the hearing thereof shall be served not less than five (5) days before the time specified for the hearing, unless a different period is fixed by these rules or by order of the court." During the hearing, the trial court consulted the parties, noting that "yesterday a Verified Petition for Emergency custody was filed," but that counsel for Father had informed the court that they are "willing to address this motion here today." (Tr. p. 120). Mother did not object and presented her evidence related to her petition. As Mother had the opportunity to present evidence and introduce exhibits related to her emergency petition, she cannot now be heard to complain.

## III. *Modification of Parenting Time*

[22] Next, Mother claims that the trial court abused its discretion by modifying her parenting time with J.F., modifying child support, and modifying the parties' financial obligations with respect to the children's extra-curricular activities. Again reiterating her arguments about the trial court's treatment of her emergency petition for modification of J.F.'s custody—which we rejected—

Mother contends that as the custody issue should not have been decided, the parenting time should likewise not have been altered. Moreover, as "[n]o motion was ever filed to address extra-curricular expenses," the trial court's order abused its discretion in ordering them split. (Appellant's Br. p. 20). Father, on the other hand and without any reference to the record, responds that "[i]n addition to the motion for a modification of custody and parenting time, Father's motion included the language 'and for all other just and proper relief in the premises,' which would properly include child support." (Appellee's Br. p. 30).

[23] Indiana Appellate Rule 50(A)(2)(f) provides that the Appellant's Appendix shall contain "pleadings and other documents from the Clerk's Record in chronological order that are necessary for resolution of the issues raised on appeal." Mother's Appendix only includes the chronological case summary, and the trial court's order, while Father's Appendix included those same documents, as well as the trial court's order of June 1, 2017, the order of April 19, 2017, and mother's emergency petition for custody of J.F. Neither party provided us with any other motions, and most notable in absence are Father's three motions for modification of custody. Because the parties failed to comply with the Indiana Appellate Rules, we have no basis on which to review the substantive issue of parenting time and child support with regard to J.F. Mindful of the discretion yielded by trial courts in family matters, we affirm the trial court's Order.

IV. *Parenting Time Coordinator*

[24] Lastly, Mother complained that during the hearing the trial court had agreed that the parenting time coordinator could modify Mother's parenting time pursuant to the Indiana Parenting Time Guidelines. Mother maintains that even though the trial court stated that this would be memorialized in its written Order, the Order does not contain this language.

[25] When discussing parenting time, the trial court stated:

> [TRIAL COURT]: Well that's now modified. [J.F.'s] parenting time with [Mother] is going to be modified to supervised. There will be no summer parenting time as it is, unless that is addressed at a later hearing and I reverse myself, but as of now parenting time with [Mother] and [J.F.] will be supervised.
> [MOTHER]: And how long will that be?
> [TRIAL COURT]: Until further order of the [c]ourt.
> [MOTHER]: What do I need to abide by that. Do I need to see this evaluation [sic]?
> [TRIAL COURT]: [The parenting time coordinator] is going to coordinate you[r] parenting time with [J.F.] and [A.F.] Once I receive an evaluation from an accredited psychologist that shows that there's no issues with you, no danger to the children, then [the parenting time coordinator] will have the discretion to increase parenting time pursuant to the Indiana Parenting Time Guidelines. And she will not have to have the assistance of the [c]ourt in doing that.
>
> * * * *
>
> [TRIAL COURT]: [] [B]ut before you're [sic] parenting time is increased, we would have to have that information.

(Tr. pp. 216-16). Accordingly, while Mother is correct that the parenting time coordinator can increase her parenting time without the involvement of the trial court, the trial court did not bestow this discretion on the parenting time coordinator until the trial court receives the report of Mother's psychological

evaluation. As Mother does not dispute the order of a psychological evaluation, we affirm the trial court.

# CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion by modifying the custody and parenting time of the minor children in favor of Father.

Affirmed.

Baker, J. and Brown, J. concur